**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Tyrone PRYOR, Defendant–Appellant.**

**No. 94–1442.**

United States Court of Appeals, Seventh Circuit.

Argued Aug. 2, 1994.

Decided Aug. 22, 1994.

Daniel P. Bach, Asst. U.S. Atty., Madison, WI (argued), for plaintiff-appellee.

Peter L. Steinberg, King Street Alternative Law Office, Inc., Madison, WI (argued), for defendant-appellant.

Before COFFEY, EASTERBROOK, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

Tyrone Pryor drove Rochelle Mallit and her children to a social security office, where she was arrested for making false statements in an effort to obtain a social security number and card. Mallit's arrest raised the question what was to become of her children, still in the parking lot with Pryor. The agents who arrested Mallit could not simply ignore the children. See *White v. Rochford*, 592 F.2d 381 (7th Cir.1979). They did not know whether the man in the parking lot would care for them. So they asked him (and the children) to come inside, where they posed a few questions.

Pryor told John Isely, an agent of the Inspector General's Office of the Department of Health and Human Services, that he was "Michael Recob." He produced a driver's license and social security card in the name "Michael Scott Recob." Although Isely and his companion Deputy U.S. Marshal John Donahue did not know it yet, Michael Scott Recob had died in 1964, and Pryor had procured the social security card by deceit and used it to obtain a driver's license. Pryor was not carrying a license in his own name because it had been suspended, and he could not legally drive. Isely wrote the name and social security number in his notebook; Donahue checked and found that Recob was not a fugitive. Mallit said that her children could stay with "Recob" until her release, and he left with them while Isely and Donahue took Mallit to be booked. The entire procedure lasted less than 15 minutes. After Isely discovered that the real Michael Scott Recob had been buried long ago (at the age of seven days), Pryor was tracked down through a telephone number he had given to Mallit and charged with using a social security number obtained on the basis of false information. 42 U.S.C. § 408(a)(7)(A). A jury convicted him of this offense, and the court sentenced him to eight months' imprisonment plus three years of supervised release.

■ Section 408(a)(7)(A) condemns
willfully, knowingly, and with intent to deceive, [using] a social security account number, assigned by the Secretary ... on the basis of false information furnished to the Secretary....

According to Pryor, the evidence is insufficient because the prosecutor did not establish the mental state essential to the offense. When Isely asked for identification, Pryor contends, he pulled out of his pocket whatever happened to be there. Although these documents had been obtained by fraud, he did not present them to Isely "willfully, knowingly, and with intent to deceive". As his lawyer put it at oral argument, Pryor believes that he was "unlucky": he planned to cozen traffic police rather than federal officials. But this "explanation" shows that deceit was the only reason for obtaining and carrying these documents. That Pryor planned to bilk local rather than federal officials is no defense. Cf. *United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). Isely and Donahue wanted to find out whether Mallit's children safely could be entrusted to Pryor; he furnished credentials that prevented an accurate inquiry. Pryor readily could have told them his true name; he could have left the papers in his pocket; instead he lied and backed up the falsehood with fraudulently obtained documents. A jury could conclude, without departing from rationality, that Pryor acted "willfully, knowingly, and with intent to deceive".

■ At trial Pryor also argued that he had not employed "a social security account number, assigned by the Secretary". Isely's notebook records the name "Michael Scott Recob" and a social security number one digit different from Recob's. If the number in the notebook was the number on the card, then, Pryor believes, his conduct falls outside the statute. Isely testified that he had recorded the number incorrectly. Pryor asked the judge to instruct the jury that:

If a party offers weaker or less satisfactory evidence when stronger or more satisfactory evidence could have been produced at trial, you may, but are not required to consider this fact in your deliberations.

Notes are weak evidence, Pryor argued, when Isely could have made and produced a photocopy of the documents. The judge declined to give this instruction, lifted from a formulary. He might have declined on the ground that it is pabulum. Telling the jury that it may, but needn't, "consider" a fact is not informative. Of course the jury may *consider* the strength of the evidence. Why give vapid instructions that add nothing to the arguments of counsel? What Pryor may have had in mind is a parallel to a missing-witness instruction, which tells the jury it may draw an inference that the evidence not produced would have been adverse to the party who could have, but did not, produce it. We have discouraged the giving of such instructions on the ground that they, too, duplicate arguments of counsel and breed unnecessary disagreements about when evidence

was indeed peculiarly within the control of a given party. See *United States v. Sblendorio,* 830 F.2d 1382, 1390–94 (7th Cir.1987). At all events, an adverse-inference instruction is appropriate only if there is other evidence. If Isely had made a photocopy and the prosecution failed to produce it, Pryor could have asked the jury to infer that the photocopy would have undercut the case against him. See *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939). But Isely did not copy the documents, so there was no basis for such an inference, and the judge acted well within his discretion in rejecting the banal instruction Pryor proposed.

■ Having denied guilt and put the prosecution to its proof on every element of the offense, and having argued even on appeal that he is not guilty, Pryor also contends that the district judge erred by withholding a two-level reduction for acceptance of responsibility. He did not accept responsibility; to this day he denies guilt. The reduction provided by U.S.S.G. § 3E1.1 is designed to *differentiate* defendants whose pleas of guilty not only save judicial and prosecutorial time but also presage a lower risk of recidivism. Extending the reduction to persons such as Pryor who deny every element of the offense would prevent the achievement of these objectives. Frivolous arguments such as this may color an appellate court's perception of the defendant's other contentions. See *United States v. Gomez,* 24 F.3d 924, 926 (7th Cir.1994). Counsel must recognize that confining their presentation to serious arguments is more than just an ethical obligation; it is a cornerstone of sound advocacy. *Jones v. Barnes,* 463 U.S. 745, 751–53, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983).

■ Pryor might have been able to obtain the reduction by entering a conditional plea of guilty, for he has one legal issue independent of the merits. He asked the district judge to suppress evidence obtained in Inspector Isely's office—evidence that Pryor contends is fruit of both an illegal detention and failure to give *Miranda* warnings. This motion poses a series of questions. Did Isely and Donahue detain Pryor, or was the entire encounter voluntary? See *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1992). If the encounter was in any respect non-consensual, did Isely and Donahue have cause adequate to support the limited intrusion? See *United States v. Chaidez,* 919 F.2d 1193 (7th Cir.1990). Does it matter to the issue of "cause" that it was possible, at least in principle, to ignore Pryor and turn the children over to local welfare officials, or was that course itself dubious? (If Pryor had turned out to be a relative of the children, he could have argued that separating him from them violated everyone's rights.) Did the request to move from the parking lot to the office turn an initially consensual conversation into "custody"? Does it matter to this issue that Isely stood between Pryor and the door and asked him to submit to a frisk? If the office interview was "custody," was the series of factual questions about Pryor's name and relationship to the children "custodial interrogation"? See *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). This is a nice list of questions, but none of the answers matters. Pryor did not divulge *evidence* of some prior crime during his few minutes in the office; instead he *committed* a crime, which makes all the difference.

■ Pryor does not contend that illegal detention justifies the commission of a crime as a means of obtaining freedom. At common law a person could use "no more force than was absolutely necessary" to resist an unlawful arrest. *Bad Elk v. United States,* 177 U.S. 529, 535, 20 S.Ct. 729, 731, 44 L.Ed. 874 (1900). Today most jurisdictions, following the *Model Penal Code* § 3.04(2)(a) (1962), require citizens to endure even an unlawful arrest without resorting to force, on the ground that the indignity and inconvenience if the arrest turns out to be improper are less serious than the injuries (and the frustration of lawful police activity) engendered by encouraging suspects to make their own snap judgments about the legality of official demands. See *United States v. Ferrone,* 438 F.2d 381, 389–90 (3d Cir.1971); Wayne R. LaFave, 1 *Search and Seizure* § 1.13(a) (2d ed. 1987). What is true about force is also true about other self-help responses to arrest. A person believing himself illegally in captivity may not offer the officer a bribe in an effort to win his freedom; similarly the

suspect may not lie in an effort to throw the police off the scent. *United States v. Troop*, 235 F.2d 123 (7th Cir.1956); *United States v. Garcia–Jordan*, 860 F.2d 159 (5th Cir.1988). Pryor could have remained silent when asked for information; he could have explained the significance of the papers in his pocket and thus avoided using them deceitfully; what he could not do was misrepresent his identity by using wrongfully procured documents. Cf. *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977) (even if the grand jury should not have asked a question, the witness may not respond by lying).

Although Pryor does not believe that illegal captivity is a defense to the crime of which he was charged, he contends that the evidence of the acts *constituting* the crime should have been suppressed. These come to the same thing, however; to suppress the evidence would be to say that the suspect is indeed free to commit the crime. The exclusionary rule, whether under the fourth or fifth amendment, does not reach so far. The Supreme Court devised the exclusionary rule to reduce incentives to violate the Constitution by preventing the prosecutors from using evidence the police turn up. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *INS v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Police do not detain people hoping that they will commit new crimes in their presence; that is not a promising investigative technique, when illegal detention exposes the police to awards of damages. Thus the gains from extending the rule to exclude evidence of fresh crimes are small, and the costs high. If the rule were applied rigorously, suspects could shoot the arresting officers without risk of prosecution. An exclusionary rule that does little to reduce the number of unlawful seizures, and much to increase the volume of crime, cannot be justified. So the evidence was admissible, and the conviction stands.

AFFIRMED.