Michael J. DOLSON, Appellant,

v.

UNITED STATES, Appellee.

No. 05–CF–1438.

District of Columbia Court of Appeals.

Argued Jan. 22, 2008.

Decided May 29, 2008.

Mikel–Meredith Weidman, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Bryan Seeley, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Thomas J. Tourish, Jr., and Mark J. O'Brien, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and GLICKMAN, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

Michael Dolson appeals from his conviction on one count of assaulting, resisting, opposing, impeding, intimidating, or interfering with a police officer, D.C.Code § 22–405(a) (2001), commonly referred to as assault on a police officer or APO. We affirm.

## I.

The conviction arose from an incident between Dolson and Metropolitan Police Department Officer Maurice Clifford on April 27, 2005. While on patrol, Officer Clifford saw Dolson riding his bicycle and emptying a small bag of what the officer

believed was narcotics.[1] At this point, Officer Clifford called out to Dolson to stop and ordered him off of his bicycle. Dolson ignored the order and rode away. Officer Clifford then followed Dolson in his patrol cruiser until Dolson stopped in front of a house where (it was later revealed) Dolson lived with his grandmother.

Upon arriving at the house, Officer Clifford left his patrol cruiser and walked up several steps to the front gate—a latched, swinging gate in a chainlink fence that separated the house from the street. Three of Dolson's neighbors, Tracy Crutchfield, Ursula Churn, and Napoleon Pope, observed the ensuing incident between the officer and Dolson. These three, as well as Officer Clifford, testified that during the encounter Dolson and the officer were separated by the fence, with Dolson inside and Clifford on the street side. Moreover, all four witnesses testified that Officer Clifford had attempted to enter the gate but that Dolson prevented him from doing so. Furthermore, all the witnesses testified that Dolson and Officer Clifford had engaged in a physical altercation that culminated in Dolson's striking the officer in the face (and, as a result, breaking his nose). The three neighbors also testified, however, on Dolson's behalf, that Dolson had struck Officer Clifford in self defense while Clifford was choking him.

At trial, the government offered two alternative theories of conviction under the APO statute: the jury could convict Dolson either for (1) his blow against Officer Clifford ("assaults") or for (2) his conduct at the gate preventing the officer from entering the yard ("resists, opposes, impedes, intimidates, or interferes").[2] As to the latter, the government argued that an APO violation occurred when the officer attempted to "get through the gate, push[ed] on one side of the gate while Mr. Dolson is on the other side of the gate, resisting, pushing back, interfering with his ability to get through that gate."

Before closing argument, defense counsel tried to persuade the court that the government's second theory of conviction required additional instructions to the jury. First, citing the Fourth Amendment, counsel argued that "it is not a crime to simply stand on your … property, with an officer who may or may not be mistaken, and to say you can't come in here[;] … you need a warrant to come into my house." Second, counsel argued that Dolson's "keeping his hands on his own gate" was not sufficient for a finding of willfully resisting, opposing, impeding, etc., within the meaning of the APO statute. Later, after closing argument, defense counsel proffered specific instructions incorporating these two understandings of the law.[3] The trial court

1. Dolson was not charged with a narcotics offense.

2. D.C.Code § 22–405(a) (2001) (APO statute) provides:

 Whoever without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with any officer or member of any police force operating in the District of Columbia, … while engaged in or on account of the performance of his or her official duties, shall be fined not more than $5,000 or imprisoned not more than 5 years, or both. It is neither justifiable nor

 excusable cause for a person to use force to resist an arrest when such arrest is made by an individual he or she has reason to believe is a law enforcement officer, whether or not such arrest is lawful.

3. Under one theory of the government's prosecution Mr. Dolson is accused of standing on his property, behind his fence, and requesting that a police officer obtain a warrant before entering. In order for that action to be criminal and not protected action, the government must prove beyond a reasonable doubt that Mr. Dolson was willfully and intentionally

declined to give them. That refusal is the subject of this appeal.

## II.

 "In determining whether [a] requested defense instruction was properly denied, we must review the record in the light most favorable to [the defendant]. A defendant is entitled to an instruction on any issue fairly raised by the evidence[,] ... [and a] special instruction is warranted when there is evidence of special facts sustaining a rational defensive theory." *Fearwell v. United States*, 886 A.2d 95, 100 (D.C.2005) (citations and internal quotation marks omitted). Accordingly, "if there is evidence—however weak—to support it, a defendant is entitled to a requested instruction...." *Id.* at 101; *see Hernandez v. United States*, 853 A.2d 202, 206 (D.C. 2004). A court, however, need not give instructions that "require the jury to engage in bizarre reconstructions of the evidence." *McClam v. United States*, 775 A.2d 1100, 1104 (D.C.2001) (citation and internal quotation marks omitted).

Defense counsel premised the first requested instruction, *supra* note 3, on the proposition that there was evidence from which the jury could find that Dolson had prevented Officer Clifford from entering his yard solely by verbally asserting his Fourth Amendment right to be free of any intrusion by the officer without a warrant. Counsel's premise reflects a correct statement of law. *See Camara v. Municipal Court*, 387 U.S. 523, 532–533, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (Fourth Amendment precluded conviction for denying housing code inspector entry into home without warrant); *District of Columbia v. Little*, 339 U.S. 1, 6, 70 S.Ct. 468, 94 L.Ed. 599 (1950) (Fourth Amendment concerns, coupled with doctrine of constitutional avoidance, precluded conviction for violation of local regulation after respondent refused to unlock door for health inspector's warrantless entry); *United States v. Prescott*, 581 F.2d 1343, 1350–1351 (9th Cir.1978) (consistent with Fourth Amendment, refusal to unlock door despite demands of warrantless police officers could not be used as evidence of harboring or concealing suspected felon).[4]

 Despite counsel's correctness on the law, there is a difficult question on this record whether the jury could have reasonably construed the evidence to support a finding that Dolson had used words alone to impede Officer Clifford's entry. But even if such an understanding of the evidence were possible, the defense did not present it clearly enough for us to say that counsel kept the requested instruction alive and that the trial judge committed reversible error in declining to give it. We shall look, first, at the evidence on which Dolson relies and then address the manner in which counsel dealt with it in advising the court how to instruct the jury.

At trial, Officer Clifford, Tracy Crutchfield, and Ursula Churn all testified that Dolson had physically restrained Clifford from entering the gate. Initially, the offi-

---

interfering with the police and not asserting his constitutional rights. If you find that Mr. Dolson "interfered" with the police officer by requesting that the officer follow the law and obtain a warrant you must find him not guilty.

Under one theory of the government's prosecution, Mr. Dolson is accused of standing on his property, behind his fence, and holding the fence. In order for that action to be considered "interference" the action must involve a willful physical action directed toward the police officer and not his own property.

4. In commenting on counsel's premise underlying the first requested instruction, we do not opine on the legal validity of the particular language counsel proffered. *See supra* note 3.

cer testified: "I believe he was trying to impede by—hold the gate with his foot." Later, he added that Dolson had "had his hands on the gate." Crutchfield agreed that Dolson, while verbally expressing his refusal to allow Officer Clifford into the yard, "was either holding the gate or stopping the gate from being pushed open." And Churn acknowledged that Dolson and Clifford were "tugging back and forth at the gate."

For evidence that Dolson used words alone to restrain Officer Clifford, Dolson relies on the fourth witness, Napoleon Pope, who testified on cross-examination as follows:

Q. Michael Dolson, after he—he comes back down to the gate and he closed the gate, right?

A. Yeah, and he locked it.

Q. And he locked it. Okay. And it was at this point in time that Officer Clifford walks up to the gate and he tries to get through the gate?

A. Yes.

Q. Michael Dolson wouldn't let him get through the gate?

A. Told him he had no warrant to come through his gate.

Q. And so he was preventing him from getting through that gate?

A. Right.

The defense argues that because Dolson's words at the scene ("[t]old him he had no warrant") were unaccompanied by a reference to any other specified action, the jury could reasonably have found from

Pope's testimony that Dolson's words alone were the sole barrier Dolson erected to forestall Officer Clifford's entry ("*And so* he was preventing him from getting through the gate"? "Right.") (emphasis added). At first glance, this particular portion of Pope's testimony—the only testimony on which the defense relies for the first proffered instruction—is sufficiently ambiguous to permit the defense interpretation as one (though not the only) possibility.[5] On the other hand, in light of unanimous testimony by the other witnesses that physical restraint had been used, Dolson's testimony could be understood to convey little more than an end result: Dolson "was preventing" entry by means not necessarily limited to speech.[6] We need not resolve, however, whether the evidence would have supported the first, "words only" instruction defense counsel submitted; as the proceedings at trial make clear, that request was effectively withdrawn.

When defense counsel, before closing arguments, asked for an instruction that the jury could not convict Dolson for telling Officer Clifford that he could not come into the yard without a warrant, the trial judge replied that the testimony showed "the defendant was *preventing* the officer from opening the gate." (Emphasis added.) Instead of responding directly to the judge's comment about prevention, defense counsel replied that he was afraid the jury "may disbelieve everything about Officer Clifford, essentially the government's case, but convict [Dolson] for saying you need a

---

5. The word "so" can mean "in the same manner or way" ("Told him he had no warrant.... And [in that same way] was preventing...."). MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed.2003), at 984. Alternatively, "so" can mean "therefore" ("Told him he had no warrant.... And [therefore] was preventing....") *Id.* Whereas the former equates

prevention with "told," the latter leaves open other methods of prevention.

6. Unlike the word "so," *see supra* note 5, the word "prevent" is not ambiguous. It means "to deprive of power"; "to keep from happening"; "to hold or keep back"; "to interpose an obstacle." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, *supra* note 5, at 1182.

warrant to come on my property." The government responded that it was "not suggesting that the defendant's statement[s] are a violation of the statute. It's his conduct of holding the gate shut." The government then stressed that according to the jury instruction (4.11) explaining the APO statute, one "cannot interfere with that officer, even if that officer is making a stop that turns out to be unlawful."

Instead of replying that the government was proceeding from a false "holding the gate" premise, and that Pope's testimony could be understood to mean that Dolson had tried to use words alone to keep Officer Clifford out, defense counsel shifted his position to embrace the government's theory:

> I am surprised that we are at this moment, where the government's case is going to be, ladies and gentlemen, Mr. Dolson should face a five-year felony *for keeping his hands on his own gate.* ... I would ask this Court to not read the jury instructions so broadly to make them essentially encompass anyone invoking their constitutional rights for their own property. [Emphasis added.]

The government then reiterated its statutory argument: "Even if ... it is an unlawful stop, ... it does not change the inquiry, so long as the officer used a reasonable amount of force at this time. And the judge concluded, "Okay. So I'll read that instruction [4.11] as it is." Defense counsel, therefore, did not ask the court to come to grips with a "words only" interpretation of Pope's testimony. Even defense counsel, at this point, appeared to concede that his constitutional argument was limited to words plus "hands on his own gate."

After the closing arguments, however, but before the jury had been instructed, defense counsel returned to his "words only" argument.

> [T]he jury is essentially going to be confronted with the issue of whether Mr. Dolson assaulted a police officer *by standing in his yard in front of his fence, asserting his constitutional right to say you need a warrant.* That is not what the assault on a police officer statute was meant for, I don't believe. [Emphasis added.]

> And I think that there is a problem also in the way the case was tried in that in that situation where we were on notice that there was an actual altercation involving both physical—alleged physical violence with Officer Clifford and alleged physical violence with Michael Dolson, *the trial strategy in the case and the excessive force and everything was predicated on that altercation, not on the altercation of what happened before, where someone is standing there* .... And the idea that the government can get up in closing and say that the altercation was not the broken nose, not the punch, *but merely the standing in front of a gate* I think would have been litigated before hand and there would have been more pretrial things before that.

> And so my suggestion, I guess the first suggestion, would be to request a mistrial. But in the alternative, I would ask that the Court consider an amended instruction to the jury *about that issue.* ... [Emphasis added.]

Counsel's concern may have been rekindled—although he never said so—by a rhetorical question the prosecutor asked during rebuttal closing argument:

> And then it comes down to Mr. Pope. Mr. Pope [sic: Officer Clifford] hears this information about the search warrant, that he needs to have a search warrant. Well, what does that tell you, ladies and gentleman? Even if that's true—which the officer doesn't remem-

ber it. *Even if that's true, its telling you that this particular person was telling this officer that he couldn't get up those steps, that he wasn't permitted to go through the gate. Does it sound like interfering?* [Emphasis added.]

Here, the prosecutor appeared to be saying (contrary to its "holding the gate" theory of the case) that "words only" *could* amount to "interference," in violation of the APO statute, the very incorrect statement of the law that defense counsel had been trying to prevent. But when counsel asked for consideration of "an amended instruction to the jury about that issue," he was not referring to the "words only" issue or even, in particular, to the prosecutor's rebuttal. Rather, as the ensuing discussion with the judge made clear, he was referring to the need for an instruction that told the jury it must be unanimous about what happened. Counsel asked for an instruction that in order to convict of assault, the jury must be unanimous about the incident at the fence or the incident involving the punch.

The court invited counsel to submit such an instruction. He did, and the government and the court eventually agreed with it. At the same time, counsel also submitted, without invitation, the two instructions at issue in this case. The only instruction counsel discussed with the court and the prosecutor, however, was the second one, which he characterized as an instruction directed in part at clarifying the mens rea requirement when one is "holding one's own property, ... the equivalent of turning the lock and saying, sir, go get a warrant." Counsel continued:

> I think that this jury needs to be instructed on, one, that if this case is going to turn on standing on your gate, *holding a gate while a police officer without a warrant is trying to get in,* there does need to be a mens rea ele-

ment to it. . . . I don't think there's a case on it precisely, but there must be something more than the equivalent of turning the lock to say, officer, go get a warrant before you come in.

> And, second, that interference, *that physical interference,* like if you picture my example of *you're at your home and you turn the lock, the interference is physical with your own property?* Right? It's the content of your property. It's not like—it's not even like necessarily slamming the door in the police officer's face, it's more of like keeping the status quo, which is what happened here.

> I think the jury needs to be instructed that if Mr. Dolson *did the equivalent of closing—you know, locking the door* and saying, sir, if you want to come into my house, you've got to get a warrant because that's the law, that's the Constitution, then they should know that, or else they could very well convict him based on the fact of him standing by the door doing something that he may well have the right to do. [Emphasis added.]

Counsel, therefore, once again shifted the discussion exclusively to physical restraint—"holding a gate"—the stuff of his second requested instruction. Of especial significance, moreover, counsel never objected to the prosecutor's rhetorical question in rebuttal closing argument. He did not move to strike it when uttered, which would have forced the issue whether a corrective instruction was necessary and very well might have—indeed, should have—given the defense the "words only" instruction counsel had asked for, however faintly, before closing arguments. Nor did counsel cite the prosecutor's rhetorical question later, after closing arguments, as grounds for a contention that his first proffered instruction was necessary then, if not earlier.

We shall assume for sake of argument that defense counsel had a colorable argument that Pope's testimony permitted a finding that Dolson had used "words only" (despite Dolson's acceptance of the prosecutor's use of the word "prevent"), and that these words—when premised on the Fourth Amendment—did not amount to "interference" under the APO statute. On those assumptions, the defense would have been entitled to a "words only" instruction. But, by failing in colloquies with the court to isolate his "words only" argument effectively from his "holding the gate" argument, and by failing even to mention his first, post-argument instruction proffered to the judge—preferring to argue only for the second instruction—counsel did not present the point with noticeable conviction. It was as though he considered it a proverbial throw away line, believing either that legally his argument was just as strong with Dolson's hands on the gate, or that factually hands-on-gate was the only realistic argument he could make—we don't know which. Perhaps it was both.

Counsel's ambivalence becomes even more evident because he failed to take advantage of an unquestionable opportunity—the prosecutor's rhetorical question during rebuttal—to obtain the corrective instruction the defense desired. Accordingly, even if one could say that Pope's testimony justified a "words only" instruction, counsel did not ask for it in a way, sufficiently distinguishable from the "words-plus-holding-the-gate" theory, that we can say the trial court perceived a serious defense effort to have the jury focus on Pope's words alone.

■ In short, counsel in the end left his "words only" instruction on the cutting room floor, a legal abandonment that may have reflected a belief that the evidence would not support the instruction anyway. Accordingly, we are unable to say that the trial court erred in failing to give a "words only" instruction.[7]

### III.

■ According to the second requested instruction—the one for which trial counsel argued vigorously, as we have seen—one's "standing on his property, behind the fence, and holding the fence" is not " 'interference' " under the APO statute unless the action involves "a willful physical action directed toward the police officer." *Supra* note 3. In support of that instruction, counsel argues that the correct interpretation of the APO statute, informed in part by Fourth Amendment concerns, permitted Dolson to employ not only words but also "passive resistance or avoidance" to bar the officer's entry. *In re C.L.D.*, 739 A.2d 353, 357 (D.C.1999) (per curiam) (reversing adjudication that juvenile violated APO statute by directing profanity at police officer and attempting to walk away when officer directed him to remain). Therefore, says counsel, the trial court erred in refusing the second instruction because the record supported a finding that Dolson's actions at the gate met the

---

7. Nor has Dolson demonstrated plain error sufficient for reversal. Even if we were to assume, for sake of argument, that the trial judge plainly erred in declining to give Dolson's first proffered instruction, see *supra* note 3, such error did not affect his "substantial rights." *United States v. Olano*, 507 U.S. 725, 734–735, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In light of the fact that three defense witnesses agreed that there has been

"tugging back and forth" or "trying to impede" or "stopping the gate," and that witness Pope himself acknowledged that Dolson had been "preventing [the officer] from getting through that gate," we cannot say that the judge's omission of the instruction had a "prejudicial impact on the jury's deliberations." *Id.* at 734, 113 S.Ct. 1770 (citation and internal questions marks omitted).

"passive resistance" test. Merely by "keeping his hands on his own gate," the argument goes, appellant Dolson—in the words of a leading case from this court— did not violate the statute by "cross[ing] the line into active confrontation, obstruction or other action directed against [Officer Clifford's] performance in the line of duty." *Id.* (footnote omitted). In sum, defense counsel told the trial court that the second proffered instruction was necessary to inform the jurors that they could not convict Dolson for violating the APO statute if they found that he had limited his conduct to "holding the gate" closed— the equivalent of "locking the door and saying, sir, if you want to come into my house, you've got to get a warrant."

According to the trial record, Ursula Churn testified that Dolson and Clifford had been "tugging back and forth on the gate." Clifford himself, along with Tracy Crutchfield, testified that Dolson had "had his hands on the gate." And Clifford further testified that Dolson had also been "trying to impede" by holding the gate "with his foot," while Crutchfield confirmed that Dolson had been "stopping the gate from being pushed open." Only Napoleon Pope limited his specifics regarding Dolson's conduct to a verbal confrontation and unspecified "prevention" before the fight broke out. On this record, counsel argues that evidence would support a finding that Dolson had merely held the gate "to reinforce an existing property barrier" and thereby engaged in no more than the passive resistance that we said in *C.L.D.* the law allows.

As noted earlier, one has a Fourth Amendment right to deny police officers and other government officials a warrantless entry into one's home, and thus one's assertion of this right cannot serve as the basis for a criminal conviction or evidence of a crime. *See Camara,* 387 U.S. at 540, 87 S.Ct. 1727; *Little,* 339 U.S. at 7, 70 S.Ct. 468; *Prescott,* 581 F.2d at 1350–1351. This right to deny entry to a warrantless officer is not unlimited, however, despite the constitutional right involved. The Supreme Court emphasized in *Little* that appellant had "neither used nor threatened force of any kind" in her refusal to allow a municipal health inspector to enter her apartment. 339 U.S. at 5, 70 S.Ct. 468. And, as the Ninth Circuit stressed in *Prescott,* if appellant had "forcibly resisted the entry into her apartment, we might have a different case." *Id.* at 1351. Why so? Presumably because, just as no one has the right to resist an unlawful arrest,[8] no one has the right to resist an unlawful entry to make an arrest.[9]

8. D.C.Code § 22–405(a), *supra* note 2; *see State v. Dawdy,* 533 N.W.2d 551, 555 (Iowa 1995) ("Even though an initial arrest is unlawful, a defendant has no right to resist the arrest."); *People v. Hess,* 687 P.2d 443, 445 (Colo.1984) (en banc) ("Even if the stop or the taking into protective custody was unlawful, we conclude that the defendant had no right to resist an arrest...."); *Commonwealth v. Moreira,* 388 Mass. 596, 447 N.E.2d 1224, 1227 (1983) ("[I]n the absence of excessive or unnecessary force by an arresting officer, a person may not use force to resist an arrest by one who he knows or has good reason to believe is an authorized police officer, engaged in the performance of his duties, regardless of whether the arrest was lawful in the circumstances.").

9. *United States v. Ferrone,* 438 F.2d 381, 390 (3d. Cir.1971) (footnote omitted) ("[A] person does not have a right to forcibly resist the execution of a search warrant by a peace officer or government agent, even though that warrant may subsequently be held to be invalid."); *Elson v. State,* 659 P.2d 1195, 1200 (Alaska 1983) ("[A] private citizen may not use force to resist a peaceful search by one he knows or has good reason to believe is an authorized police officer performing his duties, regardless of whether the search is ultimately determined to be illegal."); *State v.*

The rationale for this rule is firmly rooted in public policy: "If resistance to an arrest or a search made under the color of law is allowed, violence is not only invited but can be expected. Self-help exposes both the officer and the suspect to graver consequences than an unlawful arrest." *State v. Hatton,* 116 Ariz. 142, 568 P.2d 1040, 1045–1046 (1977) (en banc) (citations omitted); *see also United States v. Pryor,* 32 F.3d 1192, 1195 (7th Cir.1994) (explaining that citizens must "endure even an unlawful arrest without resorting to force" because the "indignity and inconvenience" of an improper arrest do not outweigh the potential for injuries when a suspect is left to "make their own snap judgments about the legality of official demands"). Furthermore, an individual wronged by an unlawful search or arrest has recourse through legal means, such as the exclusionary rule or civil claims for constitutional rights violations, and need not resort to physical violence in order to protect his or her rights. *Hatton,* 568 P.2d at 1045.

▮ This court has recognized the public policy limitation on interference with a police officer. In *C.L.D.,* we noted that a principal rationale of the APO statute, which prohibits forceful resistance even if the officer's conduct is unlawful, *see supra* note 2, is to "deescalate the potential for violence which exists whenever a police officer encounters an individual in the line of duty." 739 A.2d at 355. This concern is not limited to the officer's safety but extends to all parties involved, including the prospective arrestee. *See Hatton,* 568 P.2d at 1045–1046; *City of Middleburg Heights v. Theiss,* 28 Ohio App.3d 1, 501 N.E.2d 1226, 1230 (1985). Because of Fourth Amendment concerns, however, we employed the rule of lenity in construing the APO statute and thus weighed constitutional interests in evaluating statutory purpose. *See C.L.D.,* 739 A.2d at 356–357. As a result, we concluded that the key to establishing any violation of the APO statute is "the active and oppositional nature of the conduct for the purpose of thwarting a police officer in his or her duties." *Id.* at 357.

Based on *Camara, Little,* and *Prescott* we assume that an individual may refuse to take down a pre-established barrier— *e.g.,* to unlock a door—without violating the APO statute when confronted by a police officer seeking a warrantless entry. That constitutional conclusion is reflected in *C.L.D.*'s "passive resistance or avoidance" test. Dolson, however, would have us include within the bounds of that test action that reinforces an existing barrier, *e.g.,* locking a closed door, and even creation of a new barrier, *e.g.,* closing then locking a door—or a gate. We cannot properly do so. According to Dolson's own view of the evidence for purposes of seeking the second instruction, *see supra* note 3, Dolson effectively closed the gate, locked it, then held it. As counsel told the trial judge, Dolson "did the equivalent of closing—you know, locking the door," then "holding [the] gate while a police officer without a warrant is trying to get in." Indeed, on this record, "holding" the gate was crucial to the restraint, for, as Tracy Crutchfield testified (and the photograph in defense exhibit 6 makes clear), the gate was "just one of those gates that's an easy latch and you pull it up and you swing it open." Dolson's actions, therefore, were not "passive resistance or avoidance" with-

*Doe,* 92 N.M. 100, 583 P.2d 464, 467 (1978) ("[A] private citizen may not use force to resist a search by an unauthorized police officer engaged in the performance of his duties whether or not the arrest is illegal."); *see*

*State v. Hatton,* 116 Ariz. 142, 568 P.2d 1040, 1046 (1977) (en banc) ("[E]ven if there were a right to resist an unlawful arrest, ... there is no similar right to resist a search warrant later found to be illegal.").

in our understanding of *C.L.D.*, a decision explicating a test that incorporates Fourth Amendment, not merely public safety, concerns. The trial court accordingly did not err in denying Dolson's request for the second instruction.

*Affirmed.*