STEPHENS, J. (dissenting)
¶ 25 In asking this court to overturn his conviction, Solomon McLemore appeals broadly to privacy rights, free speech rights, and the fact that individuals owe no duty to assist law enforcement. These appeals obscure the fact that everyone, including McLemore, agrees the officers responding to the domestic violence call had the constitutional authority to demand entry pursuant to the community caretaking exception to the warrant requirement. And, settled precedent makes clear that refusing to obey lawful commands to take a specific action is conduct sufficient to support an obstruction conviction. I disagree with the lead opinion that McLemore's conviction rests "mostly" on speech and involves only passive "inaction" while inside his home. Lead opinion at 1162, 1163-64, 1166-67.
*238 ¶ 26 I would continue our long tradition of holding that individuals cannot willfully disobey law enforcement orders without facing legal consequences. Though no one owes an affirmative obligation to assist the police, obstruction in violation of RCW 9A.76.020 involves more than the mere refusal to assist. On the night in question, McLemore's right to privacy in his home yielded to the officers' authority to demand entry in order to verify the safety of the occupants inside. His obstruction conviction rests not on pure speech or mere inaction but on his willful conduct that hindered, delayed, or obstructed law enforcement in the discharge of their official duties. I would affirm the Court of Appeals and uphold McLemore's conviction.
ANALYSIS
¶ 27 This case arises in the context of officers responding to a late-night domestic disturbance call. Upon arriving outside McLemore's building, officers heard shouting and then the sound of glass breaking. When they loudly knocked on the door, all went silent. Clerk's Papers (CP) at 304, 324, 362, 365. Despite being given several explanations as to why officers were at his door and several chances to comply, McLemore refused to open the door to allow officers to verify the safety of McLemore's girlfriend, Lisa,[1] and the couple's child. Deputy Ben Emmons testified:
[I gave v]ery basic commands, clear and concise. This is Shoreline Police Department, please open the door. Shoreline Police Department, come and talk to us. Shoreline Police Department, let me see your face. Shoreline Police Department, call 911. I want to give as many options as possible. I know some people are antsy about contacting the police face to face so I *1168 took that into account. If they wanted to call 911 that was fine. If they *239 want to peek over the balcony that was fine too. I just wanted to establish some kind of back and forth and I was getting none.
CP at 364-65. When officers finally did get a response, they once again clearly explained that their intention was to verify the safety of all occupants in the home:
So as we continued kind of in this repetitive loop of conversation, at some point a female comes to the door and he said tell them you're okay. We had been telling him we need to make sure that everyone is okay. We need to know that everyone is okay because of what is going on here. So the female at some point comes to the door and he says, tell them you're okay. The female said I'm okay. A[t] this point they both said something like we're scared or something of that nature. But we tell them, we can't just take your word for it. You telling her to tell us you're okay isn't enough for us to verify that you're okay. He could be forcing you to say this. We have no idea. You're behind a door and we have no idea what's going on. We need to investigate.
CP at 330-31 (Test, of Deputy Jeremy Dallon).[2] The record continues to detail repeated instances where the officers make clear that they are giving a lawful order to open the door so they can verify the safety of the occupants inside. See CP at 302, 304-05, 314-15, 324-31, 361-80. McLemore acknowledged this fact in his testimony:
*240 They said we're coming in. We need to come in. We need to make sure everybody is okay. And I asked them all the relevant questions as to why-legal entry. Do you have anything to show me that shows me you can come in?
....
... They tell me they don't have to. They don't need to show me anything to get in. And then I tell them, well then in that case you need to go away.
CP at 414. McLemore acknowledged that the officers even gave him the option to call 911 to verify that they were the police. CP at 438; see also CP at 329 ("You can call the police, 911. They'll tell you that we're the police, let us in.") (Test, of Deputy Dallon).
¶ 28 Though the lead opinion describes the issue in this case as whether an individual has the duty to assist a warrantless search or seizure, the officers made no demand to search the home. See CP at 294-381. The record makes clear that the officers wanted to fulfill their statutory duty to verify Lisa's safety as part of their community caretaking responsibility.[3]
¶ 29 McLemore's conduct falls squarely within the ambit of the obstruction statute, and his conviction is fully consistent with constitutional guaranties of privacy and free speech. Because there is no constitutional *1169 infirmity in McLemore's conviction, I believe our judicial role requires us to apply the statute the legislature has seen fit to adopt and the executive branch has seen fit to enforce, and to respect the jury's verdict. To explain why, I first address the statute, RCW 9A.76.020, and then consider the privacy and *241 free speech rights asserted to excuse McLemore's violation of the statute.
I. Sufficient Evidence Supported the Jury's Finding That McLemore Committed Obstruction under RCW 9A.76.020
¶ 30 The statute under which McLemore was convicted provides, "A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020(1). It is undisputed that the officers responding to the 911 call were discharging their official powers or duties. Mot. for Discr. Review at 3; lead opinion at 1163. Absent a constitutional privilege, McLemore had a statutory duty not to willfully hinder, delay, or obstruct law enforcement.
¶ 31 The lead opinion frames this case in terms of a "duty to cooperate" with law enforcement and invokes the general rule that no such duty exists. See lead opinion at 1164-65. In so doing, it characterizes McLemore's conduct as involving only "passive delay" and observes that behavior causing minor delay or inconvenience does not amount to obstruction. Id. at 1164-65 (quoting State v. E.J.J., 183 Wash.2d 497, 506, 354 P.3d 815 (2015) ). I believe this misstates both the facts of this case and the valid reach of the obstruction statute. While individuals interacting with the police owe no affirmative duty to cooperate, it is well recognized they may not engage in conduct that interferes in specific ways with law enforcement officers' discharge of their powers or duties. See State v. D.E.D., 200 Wash.App. 484, 494-95, 402 P.3d 851 (2017) (recognizing valid reach of obstruction statute despite no general obligation to cooperate with a police investigation); State v. Steen, 164 Wash.App. 789, 802 n.8, 265 P.3d 901 (2011) (recognizing obstruction statute does not criminalize a "citizen's mere refusal to assist police officers performing their community caretaking duties"). Hindering or causing material delay in lawful police efforts is punishable *242 as obstruction. See D.E.D., 200 Wash.App. at 495, 402 P.3d 851 (describing examples of obstruction: interfering in the arrest of another, refusing to obey commands designed to control the scene, and failing to obey commands to exit a car and keep hands in sight).
¶ 32 In D.E.D., the Court of Appeals overturned an obstruction conviction because the charged conduct involved only "[p]assive resistance" to an unlawful arrest. 200 Wash.App. at 496, 402 P.3d 851. Central to the reasoning in D.E.D. was the fact that a separate resisting arrest statute ( RCW 9A.76.040(1) ) imposed a duty not to resist only in situations of a lawful arrest and the defendant's arrest was plainly unlawful. Id. Under the obstruction statute, the court held that D.E.D. did not "hinder or obstruct the officer since he had no obligation to cooperate with the officer." Id.[4] The court cautioned against extending its narrow holding beyond the context of "[p]assive resistance consistent with the lack of a duty to cooperate." Id.
¶ 33 Unlike the juvenile in D.E.D., McLemore did have the duty to comply with lawful police orders to open the door and allow officers to verify Lisa's safety. Describing his refusal to open the door in this context as *1170 akin to D.E.D.'s "passive resistance" requires ignoring that McLemore testified he made an intentional-found to be willful-decision to disobey a direct, lawful order. I recognize that it may be difficult in some situations to distinguish between an *243 affirmative duty to cooperate and a duty not to hinder or delay police, but this is not one of them.
¶ 34 Indeed, the facts of this case align with the cases the court in D.E.D. was careful to distinguish. 200 Wash.App. at 495, 402 P.3d 851 ; see State v. Little, 116 Wash.2d 488, 498, 806 P.2d 749 (1991) (plurality opinion) (flight from officers and refusal to stop when ordered to do so constituted obstruction of a public servant); Steen, 164 Wash.App. at 802, 265 P.3d 901 (refusal to open trailer door and exit with hands up held punishable under the obstruction statute); State v. Contreras, 92 Wash.App. 307, 316-17, 966 P.2d 915 (1998) (refusal to comply with orders to keep hands in view, exit the vehicle, and keep hands on top of the car supported obstruction conviction). The lead opinion recognizes the affinity between this case and these prior authorities, and its only response is to overrule Steen and to distinguish any case involving a car or a prior version of the obstruction statute. Lead opinion at 1165-66. This approach does not withstand scrutiny.
¶ 35 The lead opinion's dismissal of Steen appears to rest solely on the fact that Steen "relied heavily on case law that involved motor vehicles, not homes." Id. at 1166 (citing Contreras, 92 Wash.App. 307, 966 P.2d 915 ). This undeveloped analysis misapprehends the key distinction in Washington law that is explained in Steen -between the duty to follow lawful orders given by law enforcement as opposed to no duty to assist with an unlawful arrest. Compare Steen, 164 Wash.App. at 801, 265 P.3d 901 (duty to obey officer's commands), with D.E.D., 200 Wash.App. at 496, 402 P.3d 851 (no duty to cooperate in unlawful arrest). Far from supporting an automobile/home distinction, Steen explicitly states that it is following the precedent set in Contreras that "an individual's failure to follow police officers' lawful orders authorized the individual's warrantless arrest for obstruction." Steen , 164 Wash.App. at 801, 265 P.3d 901. Just as failure to comply with officer's demands to keep his hands in view and exit the vehicle constituted conduct for the purposes of the obstruction statute under Contreras, so too "refusal to open the trailer door and exit the trailer with *244 his hands up" constituted conduct in Steen sufficient to support an obstruction conviction. Id. at 801-02, 265 P.3d 901. The decision in Steen is not an outlier but instead a correct application of our precedent recognizing that failure to obey a lawful order constitutes conduct sufficient for an obstruction conviction.
¶ 36 That precedent includes this court's decisions in Williams and Little. See State v. Williams, 171 Wash.2d 474, 251 P.3d 877 (2011) ; Little, 116 Wash.2d at 488, 806 P.2d 749. In Williams, we traced the development of obstruction statutes and free speech protections and narrowly construed RCW 9A.76.020 to require some conduct in addition to making false statements in order to support a conviction. 171 Wash.2d at 481-82, 251 P.3d 877. In the course of our analysis, we cited Contreras ("refusal to put hands up in view, to exit the car, and to keep hands on top of car as instructed and providing a false name") as an example of what constitutes conduct as opposed to pure speech. Id. at 483, 251 P.3d 877. In Little, which involved a Terry[5] stop at an apartment complex, we recognized that the willful refusal to obey direct police orders violated the obstruction statute. 116 Wash.2d at 498, 806 P.2d 749 ("flight from the officers and refusal to stop when ordered to do so constituted an obstruction of a public servant").
¶ 37 The lead opinion attempts to minimize Little as having been decided under a former version of the obstruction statute, which we later declared unconstitutional. Lead opinion at 1166. The aspect of the statute we invalidated, however, involved a requirement that individuals stop and identify themselves when directed by law enforcement. See State v. White, 97 Wash.2d 92, 96-97, 640 P.2d 1061 (1982). As recently explained in E.J.J., the constitutional problem with the former statute was a provision that forced individuals to speak up and provide information to law enforcement, i.e., it punished pure speech. 183 Wash.2d at 502, 354 P.3d 815. But, we *1171 recognized that our decision in White "left intact subsection *245 (3) [of former RCW 9A.76.020 (1975) ], which made it a misdemeanor to ' "knowingly hinder, delay, or obstruct" ' a public servant." Id. (quoting White, 97 Wash.2d at 96, 640 P.2d 1061 (quoting former RCW 9A.76.020) ). While the wording of the obstruction statute has evolved to recognize that speech alone cannot support an obstruction conviction, see Williams, 171 Wash.2d at 481-83, 251 P.3d 877, the refusal to obey lawful orders of law enforcement has always been deemed sufficient conduct to support an obstruction conviction when it hinders, delays, or obstructs the performance of official duties. See id. ; Little, 116 Wash.2d at 498, 806 P.2d 749 ; Contreras, 92 Wash.App. at 317, 966 P.2d 915 ; Steen, 164 Wash.App. at 802, 265 P.3d 901. As a result, the relevant question in this case is not whether McLemore was in his home or in a vehicle, as the lead opinion would suggest. Instead, the relevant question, according to precedent, is whether McLemore's refusal to obey lawful police orders hindered, delayed, or obstructed the officers in the performance of their duties.
¶ 38 Sufficient evidence exists to support McLemore's conviction for obstruction based on his willful failure to obey a lawful police order to open the door (or to allow Lisa to open the door) in order for officers to verify the safety of the occupants inside the home. It cannot be denied that McLemore's actions had specific consequences that both hindered and delayed the officers from performing their community caretaking duties. Officers spent several minutes trying to convince McLemore or Lisa to open the door; then, after hearing glass shattering, they attempted unsuccessfully to break the door or lock with a pickax, before finally having the Shoreline Fire Department arrive with breaching tools to help police forcibly enter the home. All essential elements of the obstruction statute are supported by evidence sufficient to sustain McLemore's conviction, and we should not disturb it unless McLemore can demonstrate that his conduct was constitutionally privileged. As discussed below, he has not demonstrated that his conviction violates either his privacy rights or his free speech rights.
*246 II. McLemore's Obstruction Conviction Does Not Offend His Privacy Rights under the Fourth Amendment and Article I, Section 7 Because the Officers Acted with Authority of Law
¶ 39 Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." While the gold standard for authority of law is a judicially issued warrant, "there are a few ' "jealously and carefully drawn" exceptions' to the warrant requirement which 'provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate.' " State v. Houser, 95 Wash.2d 143, 149, 622 P.2d 1218 (1980) (quoting Arkansas v. Sanders, 442 U.S. 753, 759, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) ). Relevant here, the community caretaking exception "allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance or when making routine checks on health and safety." State v. Thompson, 151 Wash.2d 793, 802, 92 P.3d 228 (2004). Once the community caretaking exception applies, police officers are allowed to conduct a noncriminal investigation, "so long as it is necessary and strictly relevant to performance of the community caretaking function." State v. Kinzy, 141 Wash.2d 373, 388, 5 P.3d 668 (2000).
¶ 40 Both McLemore and the lead opinion acknowledge that the officers responding to the 911 call had authority of law under the community caretaking warrant exception. See Mot. for Discr. Review 8-16; lead opinion at 1163 ("McLemore, wisely, does not challenge the trial court's conclusion that the officers were exercising their community caretaking function at the time."). "Police officers responding to a domestic violence report have a duty to ensure the present and continued safety and well-being of *247 the occupants" of a home. State v. Raines, 55 Wash.App. 459, 465, 778 P.2d 538 (1989), review denied, 113 Wash.2d 1036, 785 P.2d 825 (1990). This duty is recognized in statute. RCW 10.99.030(5) provides that "[t]he primary duty of peace officers, when responding to a domestic violence *1172 situation, is to enforce the laws allegedly violated and to protect the complaining party." In addition, the legislature has decided that it is not enough for a police officer to simply observe the safety of a potential victim; even in cases where the officer has "not exercised arrest powers or decided to initiate criminal proceedings by citation or otherwise," officers are still required to "notify the victim of the victim's right to initiate a criminal proceeding" and advise all parties of the importance of preserving evidence. RCW 10.99.030(6)(a). Bearing these requirements in mind, the lead opinion concedes that "[i]t is undisputed that the officers here responded appropriately and lawfully to a potential domestic violence situation in which both Lisa and the child reasonably appeared in immediate danger." Lead opinion at 1163.
¶ 41 One is left to wonder why, then, the lead opinion embarks on a detailed privacy analysis under the Fourth Amendment of the United States and article I, section 7. Its eloquent exposition of an individual's right to keep the government from crossing the threshold to his home presupposes a different set of facts-officers seeking a warrantless entry without constitutional authority of law. See lead opinion at 1164-65. Here, the officers correctly explained to McLemore that they did not need a warrant to justify the limited intrusion they were seeking. The lead opinion seems to suggest that McLemore's refusal to open the door would be viewed differently had the officers held an actual warrant instead of authority of law under a warrant exception. Lead opinion at 1165. But, it does not explain why. Certainly, from the perspective of a person refusing an officer's command to open a door, there is no reason why the officer's assertion that he has a warrant would be any more persuasive than his assertion that he *248 has other authority of law. Moreover, neither the chilling of privacy rights that the lead opinion is concerned about nor the constitutional authority of law the officers possess varies between the warrant scenario and the warrant exception scenario. The case law the lead opinion cites speaks to a privacy right McLemore did not possess here-the right to refuse entry to officers acting entirely without authority of law under either a warrant or a recognized warrant exception.
¶ 42 In attempting to create legal justification for McLemore's actions, the lead opinion misreads Dolson v. United States, 948 A.2d 1193, 1201 (D.C. 2008). Lead opinion at 1165. While Dolson explains that individuals have a Fourth Amendment right to deny police officers warrantless entry into a home, Dolson makes clear that "[t]his right to deny entry to a warrantless officer is not unlimited, however, despite the constitutional right involved." Dolson, 948 A.2d at 1201. It provides no solace in McLemore's case because, even absent authority of law under an exception to the warrant requirement, Dolson concludes that "just as no one has the right to resist an unlawful arrest, no one has the right to resist an unlawful entry to make an arrest." Id. (footnote omitted). This holding is consistent with the precedent noted previously, recognizing that a person's recourse to unlawful police activity is through a court action, not self-help.
¶ 43 Simply stated, McLemore's conduct cannot be excused on the basis of a nonexistent privacy right. His right to deny the officers entry to his home necessarily yields to valid authority of law, under a warrant exception just as surely as under a warrant. While the lead opinion is correct that McLemore's privacy in his home is entitled to greater constitutional protection than a person's privacy in a vehicle or on the street, the greater weight of the privacy interest has no bearing on the question before us. Heightened privacy protections in the home affect the court's determination as to when authority of law exists to justify *249 an intrusion. But regardless of whether individuals are in a home, in a vehicle, or on the street, once they receive a lawful order from law enforcement, they have a statutory duty to comply. Because all parties agree that McLemore received a lawful order from the officers, we cannot excuse his willful refusal to comply with this order simply because it involved opening the door to his home.
III. McLemore's Obstruction Conviction Is Consistent with Free Speech Protections Because It Does Not Rest on "Speech Alone"
¶ 44 Having established that McLemore had no privacy-based right to disobey lawful *1173 police commands and that his refusal to open the door is punishable under the obstruction statute, I turn to the remaining proposition: that McLemore's conviction rests purely on speech rather than conduct. To avoid constitutional infirmities, Washington law requires "conduct in addition to pure speech in order to establish obstruction of an officer." Williams , 171 Wash.2d at 485-86, 251 P.3d 877 ; see also E.J.J., 183 Wash.2d at 502, 354 P.3d 815 ("a conviction for obstruction may not be based solely on an individual's speech because the speech itself is constitutionally protected").
¶ 45 Consistent with prior case law, McLemore's actions constituted punishable conduct and his conviction did not rest on "speech alone." E.J.J ., 183 Wash.2d at 503, 354 P.3d 815. His conduct included willfully and repeatedly refusing to open the door, as well as directing Lisa's response to the officers' commands, supporting a jury inference that he prevented her from opening the door. Contrary to the lead opinion's view, it is not enough to observe that "[m]uch of the evidence focused on what McLemore and the officers shouted at one another." Lead opinion at 1167. The cases that have invalidated obstruction convictions on free speech grounds all involve speech alone without sufficient evidence of accompanying conduct. In State v. Williamson, for example, the defendant was charged with obstruction for falsely telling *250 police his name was " 'Christopher Columbus.' " 84 Wash.App. 37, 45, 924 P.2d 960 (1996). Similarly, in Williams, the defendant was convicted for giving a false name to police during a traffic stop. 171 Wash.2d at 476, 251 P.3d 877. In E.J.J., we reviewed our state and related federal precedent imposing free speech limits on obstruction convictions and vacated a juvenile adjudication where there was "insufficient evidence of conduct," 183 Wash.2d at 506, 354 P.3d 815, and where we could not "be certain that E.J.J.'s conviction was not based on his speech alone," Id. at 508, 354 P.3d 815. Here, in contrast, McLemore plainly engaged in conduct in addition to speech, and there is no constitutional infirmity when both speech and conduct are present. See Williams, 171 Wash.2d at 477-78, 251 P.3d 877 ; Little, 116 Wash.2d at 498, 806 P.2d 749 ; E.J.J., 183 Wash.2d at 502, 354 P.3d 815.
¶ 46 Without doubt, our precedent confirms that obstruction statutes may be constitutionally applied to punish individuals for willful conduct in refusing to obey law enforcement directives when such conduct hinders, delays, or obstructs the performance of official duties-even when speech is also involved. Such punishment under the obstruction statute is wholly consistent with constitutional constraints because it does not rest on "speech alone." E.J.J., 183 Wash.2d at 503, 354 P.3d 815 ; see also Williams, 171 Wash.2d at 485, 251 P.3d 877 ("We hew to our jurisprudential history of requiring conduct in addition to pure speech in order to establish obstruction of an officer."). As discussed above, the metaphysical distinction the lead opinion draws between action and inaction is nowhere to be found in our precedent. When a law enforcement officer tells a person to "put your hands up" or "open the door," the willful refusal to obey this command constitutes conduct-and such conduct violates RCW 9A.76.020.
CONCLUSION
¶ 47 Thankfully, in this case there was no physical harm to any of the parties involved. But recognizing the sort of *251 "privilege to obstruct" that McLemore seeks will encourage individuals to "make their own snap judgments about the legality of official demands," Pryor, 32 F.3d at 1195, and "violence is not only invited but can be expected." Hatton, 116 Ariz. at 148, 568 P.2d 1040. There is no precedent that supports recognizing this privilege and no constitutional privacy or free speech rights at issue here that justify it. While reasonable minds might disagree about whether the officers or the prosecutor were overzealous in charging McLemore with obstruction or even whether the legislature should criminalize the refusal to obey police orders to open one's door, courts must leave those decisions to other branches of government. Our judicial role is constrained to invalidating arrest and prosecution decisions only when they result in constitutional violations. Because McLemore's conviction does not violate his constitutional rights, I would affirm the Court of Appeals and uphold his conviction.
Owens, J.
Yu, J.
Wiggins, J.

Consistent with the lead opinion, and to avoid subjecting her to unwanted publicity, I refer to McLemore's girlfriend solely by her first name. No disrespect is intended.

The lead opinion downplays the fact that McLemore told Lisa how to respond, see lead opinion at 1162 ("At McLemore's insistence, Lisa confirmed that she was fine and that she also wanted the officers to leave."), ultimately concluding there is "no evidence" he did anything to prevent her from opening the door. Id. at 1166-67. The testimony and a recording of the incident support a different conclusion. Deputy Dallon testified that Lisa "sounded like she had been crying. ... [I]t didn't sound like a calm, normal individual." CP at 331. He explained, "[McLemore] saying tell them you're okay seemed very coercive"; officers "have the legal obligation to investigate to make sure that someone who needs help isn't being prevented from getting help because of various reasons." Id. On cross-examination, McLemore grudgingly acknowledged that he told Lisa she needed to talk to the police and she needed to act mad. CP at 440. He also told her that if she opened the door and went outside, he was going to jail. CP at 441. Given this evidence, even if McLemore's own refusal to open the door might be characterized as mere "inaction"-a dubious characterization under our case law-evidence that he directed Lisa's response to the officers' commands plainly supports the jury's finding of obstruction.

RCW 10.99.030 imposes specific requirements on law enforcement when responding to a domestic violence report. For example, officers are required to "take a complete offense report including the officer's disposition of the case" and "advise victims of all reasonable means to prevent further abuse, including advising each person of the availability of a shelter or other services in the community, and giving each person immediate notice of the legal rights and remedies available." RCW 10.99.030(6)(b) -(7). The responding officers testified that it would have been difficult to fulfill their statutory duties in this instance without a visual verification of Lisa's safety and the ability to speak with her separate from McLemore. CP at 330-31, 363, 371.

This is not to say that individuals may violate unlawful police commands without legal consequences. The court in D.E.D. surveyed precedent recognizing that a person "cannot respond to police illegality by performing a criminal act in return." 200 Wash.App. at 492, 402 P.3d 851 ; see also State v. Holeman, 103 Wash.2d 426, 693 P.2d 89 (1985) (illegality of arrest did not justify hindering officers). The main rationale for this rule is public safety: the right to be free from illegal police conduct "can be protected and vindicated through legal processes, whereas loss of life or serious physical injury cannot be repaired in the courtroom." State v. Westlund, 13 Wash.App. 460,467, 536 P.2d 20 (1975) ; see also United States v. Pryor, 32 F.3d 1192, 1195 (7th Cir. 1994) (stating the "indignity and inconvenience" of an improper arrest is less serious than injuries "engendered by encouraging suspects to make their own snap judgments about the legality of official demands"); State v. Hatton, 116 Ariz. 142,147-48, 568 P.2d 1040 (1977) ("If resistance to an arrest or a search made under the color of law is allowed, violence is not only invited but can be expected.").

Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).