**FILED**

APR 19 2019

WASHINGTON STATE
SUPREME COURT



# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

CITY OF SHORELINE,

                Respondent,

    v.

SOLOMON DION MCLEMORE,

                Petitioner.

No. 95707-0

ORDER
AMENDING
OPINION

It is hereby ordered that that the lead opinion of González, J., filed April 18, 2019, in the above entitled case is changed as indicated below.

On page 17, line 2 of the slip opinion, beginning with "We", strike all material down to and including "opinion." on line 3 and insert:

We in the lead opinion would hold the city presented insufficient evidence to sustain McLemore's conviction and remand to the trial court for further proceedings consistent with this opinion. However, we recognize this opinion has garnered only four signatures. "Therefore, there being no majority for the reversal of the judgment of the trial court, it necessarily stands affirmed, and the order of this court is that the judgment appealed from be and it is hereby affirmed." *Peterson v. City of Tacoma*, 139 Wash. 313, 313, 246 P. 944 (1926).

DATED this **19th** day of April, 2019.

_____
Chief Justice

APPROVED:

_____



This opinion was
filed for record
at 8:00 on 4-18-19

Susan L. Carlson
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CITY OF SHORELINE, | ) | |
| | ) | |
| Respondent, | ) | No. 95707-0 |
| v. | ) | |
| | ) | |
| SOLOMON DION MCLEMORE, | ) | |
| | ) | Filed __APR 1 8 2019__ |
| Petitioner. | ) | |

GONZÁLEZ, J.—This case involves a clash of deeply significant public policies. As a modern society, we condemn domestic violence and have vested police with the power and duty to investigate and to intervene. As a society governed by our constitutions, there are limits on the State's power to punish speech, to demand an individual's active cooperation, or to intrude into a home.

Our homes hold a special place in our constitutional jurisprudence. It is the first place specifically called out in our constitution, and it is called out to give it special protection. Under our constitution, "[n]o person shall be disturbed in his private affairs, *or his home invaded*, without authority of law." CONST. art. I, § 7 (emphasis added). "In no area is a citizen more

entitled to his privacy than in his or her home. For this reason, 'the closer officers come to intrusion into a dwelling, the greater the constitutional protection'." *State v. Young*, 123 Wn.2d 173, 185, 867 P.2d 593 (1994) (citation omitted) (quoting *State v. Chrisman*, 100 Wn.2d 814, 820, 676 P.2d 419 (1984)). Officers must have a warrant or a well-established exception to the warrant requirement before intruding into a home. *Id.* at 181. Our constitutions also rigorously protect speech, even obnoxious speech. *State v. E.J.J.*, 183 Wn.2d 497, 501, 354 P.3d 815 (2015).

Here, a bystander called 911 about a loud, late-night argument in a home. Police officers, appropriately concerned about domestic violence, went to that home to investigate. They heard an argument and demanded entry. Solomon McLemore and his girlfriend, Lisa,[1] lived in that home, refused to open their door, and told the officers to go away. Instead, the officers broke down that door under a well-established exception to the warrant requirement: community caretaking. However, when the officers found that no one was injured and that there was no evidence of any other crime, they arrested McLemore for obstruction of a law enforcement officer. This arrest appeared to be mostly based on McLemore's belligerent refusal to open his door. He was subsequently convicted of the charge. We must

---

[1] We use only Lisa's first name to avoid subjecting her to unwanted publicity. No disrespect is intended.

2

decide whether, under the obstruction statute as properly limited to its constitutional scope and the facts of this case, the conviction may stand. It may not.

## FACTS

Late one night, a bystander heard a disturbance and called 911. Three Shoreline police officers responded and heard the sounds of an argument coming from an apartment above a dry cleaner's shop. Police heard a woman shouting, "'[Y]ou can't leave me out here,'" "'I'm going to call the police,'" and "something along the lines of 'I'm reconsidering our relationship'." Clerk's Papers (CP) at 149. The officers knocked on the door of the apartment, rang the doorbell, announced they were Shoreline police, and demanded to be let in. No one in the apartment replied, but the sounds of the argument stopped. Using amplification and much profanity, the officers insisted they would break down the door if they were not let in. McLemore told them to leave. After several minutes of this, police heard the sound of breaking glass. The officers started to break down the door.

McLemore and Lisa lived together with their six month old son in that apartment. The couple had had a difficult night. McLemore had accidentally broken a window, and Lisa was upset about having to repair it. McLemore had told Lisa he would clean up the glass but instead went to

play pool with a friend. When he came home at about one o'clock in the morning, he and Lisa argued. Since their child was asleep, they took their argument outside to a balcony. McLemore claimed he accidentally locked Lisa outside on that balcony when he came in. Minutes after he let Lisa back in, the police started banging on their door. McLemore told the officers that they were okay, that he was recording the incident, and that they should leave. At McLemore's insistence, Lisa confirmed that she was fine and that she also wanted the officers to leave. Instead, rightfully concerned about domestic violence, the officers broke down her door.

After the door was "completely destroyed," CP at 152, the officers entered with their guns drawn, handcuffed McLemore, and put Lisa and McLemore into separate police cars. Officers determined Lisa was not injured. Lisa told the officers that the couple had not opened the door because they were afraid one of them would be arrested if they did. Officers arrested McLemore for obstruction of a law enforcement officer under RCW 9A.76.020. No other charges were filed.

Before trial, McLemore moved to dismiss the charge on the grounds the city had offered "no evidence that McLemore willfully hindered or delayed an officer's lawful investigation as the law does not require any duty of a person to act in a warrantless search of their residence." CP at 139. The

4

judge denied the motion, concluding that the charges were sustainable under *State v. Steen*, 164 Wn. App. 789, 265 P.3d 901 (2011). The judge also excluded any defense related to McLemore's assertion that the officers did not have the right to enter without a warrant.

In closing argument, the city stressed that most of the elements were not in dispute. Instead, the "element that gets the bulk of the argument . . . and the bulk of the scrutiny in this testimony was did the defendant willfully hinder or delay or obstruct the discharge of [officers'] duties." CP at 468. The city characterized McLemore's refusal to open the door as a willful obstruction. Defense counsel argued that "[it is] not McLemore's job to help" the police and that "he did nothing. He simply sat in his house." *Id.* at 478.

During deliberations, the jury sent out one question: "Does a person have the legal obligation to follow the police instructions, in this case?" *Id.* at 43. The court responded, "[Y]ou have been provided with the law in this case in the jury instructions." *Id.* The instructions, including the to-convict instruction, mirrored the pattern jury instructions, and no specific instruction on a citizen's obligation to open a door to a warrantless entry was included. *See, e.g., id.* at 59; 11A WASHINGTON PRACTICE: WASHINGTON PATTERN

JURY INSTRUCTIONS: CRIMINAL 120.02, at 519 (4th ed. 2016). McLemore

was convicted.

McLemore appealed, first to the superior court, then to the Court of

Appeals, and finally here. We granted review. *City of Shoreline v.*

*McLemore*, 191 Wn.2d 1001 (2018).

ANALYSIS

We stress that we are not asked to determine whether the officers'

forced entry in McLemore's home was lawful. McLemore, wisely, does not

challenge the trial court's conclusion that the officers were exercising their

community caretaking function at the time. Based on this record, the

officers had the lawful power to enter McLemore's home to assess whether

domestic violence had occurred and to take appropriate action if it had. *See*

*Danny v. Laidlaw Transit Servs., Inc.*, 165 Wn.2d 200, 208-19, 193 P.3d 128

(2008) (plurality opinion) (surveying Washington's public policy of

combating domestic violence); ch. 10.99 RCW (establishing that domestic

violence is a serious crime and setting forth minimum standards for official

responses).[2] Analogously, officers have the statutory authority to break into

---

[2] The dissent states that "everyone, including McLemore, agrees that the officers
responding to the domestic violence call had the constitutional authority to demand entry
pursuant to the community caretaking exception to the warrant requirement" and that
"McLemore *did* have a duty to comply with lawful police orders to open the door."
Dissent at 1, 8. We respectfully disagree with this characterization of the case. We agree
that the officers had the constitutional authority to enter the home pursuant to the

6

a home to make an arrest "if, after notice of [their] office and purpose, [they] be refused admittance." RCW 10.31.040. It is undisputed that the officers here responded appropriately and lawfully to a potential domestic violence situation in which both Lisa and the child reasonably appeared in immediate danger.

But McLemore was not charged with a crime of domestic violence. Instead, he was charged with violating RCW 9A.76.020(1), which provides in relevant part that "[a] person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." In effect, McLemore contends that this statute cannot be constitutionally applied to his inaction. "We review such constitutional challenges de novo. In the context of the First Amendment, this requires a review of the record to determine that the conviction could not have been based only on constitutionally protected speech." *E.J.J.*, 183 Wn.2d at 501 (citation omitted) (citing *State v. Abrams*, 163 Wn.2d 277, 282, 178 P.3d 1021 (2008)); U.S. CONST. amend. I.

This court has long "noted that [obstruction] statutes can 'result in disturbing intrusions into an individual's right to privacy and can implicate

---

community caretaking exception to the warrant requirement. We do not agree that McLemore had a duty to comply with the police's demand to open the door.

other rights specifically enumerated in the Bill of Rights.'" *State v. Williams*, 171 Wn.2d 474, 481, 251 P.3d 877 (2011) (quoting *State v. White*, 97 Wn.2d 92, 97, 640 P.2d 1061 (1982)). "To save the obstruction statute from being unconstitutionally overbroad in a First Amendment setting, we have construed the statute narrowly. Our cases have consistently required *conduct* in order to establish obstruction of an officer." *E.J.J.*, 183 Wn.2d at 501-02 (citing *Williams*, 171 Wn.2d at 485). We narrowly construe the obstruction statute even when the parties are not directly raising a constitutional challenge. *Williams*, 171 Wn.2d at 477-78.

We use this narrow construction for two reasons. First, we are required to interpret statutes as constitutional, if possible, and our narrowing construction accomplishes this task. *See In re Pers. Restraint of Matteson*, 142 Wn.2d 298, 307, 12 P.3d 585 (2000) (quoting *Addleman v. Bd. of Prison Terms & Paroles*, 107 Wn.2d 503, 510, 730 P.2d 1327 (1986)). We also limit the scope of this statute to avoid chilling the exercise of constitutional rights. *See State v. Rupe*, 101 Wn.2d 664, 705, 683 P.2d 571 (1984) (plurality opinion) (citing *State v. Frampton*, 95 Wn.2d 469, 627 P.2d 922 (1981)); *see also E.J.J.*, 183 Wn.2d at 501-02.

Criminalizing the refusal to open one's own door to a warrantless entry would be enormously chilling and inconsistent with our deeply held constitutional values. As the United States Supreme Court observed:

> From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle. As early as the 13th Yearbook of Edward IV (1461-1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the arrest was then only for the private interest of a party. Remarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle:
>
> > "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!"

*Miller v. United States*, 357 U.S. 301, 306-07, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958) (footnotes omitted) (quoting THE OXFORD DICTIONARY OF QUOTATIONS 379 (2d ed. 1953)). Even under the more limited protections afforded by the Fourth Amendment than our own constitution, "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door

9

or to speak." *Kentucky v. King*, 563 U.S. 452, 469-70, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011) (citing *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion)); U.S. CONST. amend. IV; *see also United States v. Prescott*, 581 F.2d 1343, 1350-51 (9th Cir. 1978) (holding the right to refuse a warrantless entry is not a crime or evidence of a crime (citing *Camara v. Mun. Court*, 387 U.S. 523, 528-29, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967); *District of Columbia v. Little*, 339 U.S. 1, 7, 70 S. Ct. 468, 94 L. Ed. 599 (1950)))). Similarly, our Court of Appeals found the refusal to allow an officer into a home without a warrant was not sufficient to sustain an obstruction conviction. *State v. Bessette*, 105 Wn. App. 793, 799, 21 P.3d 318 (2001). The officer had been pursuing a juvenile who was spotted holding a beer bottle. *Id.*

Under the limited construction of the statute required by our constitution, a defendant's conduct that amounts to passive delay will not sustain an obstruction charge. [3] As we ruled recently in a case where a juvenile defendant refused to retreat into his home while police were arresting his sister in the front yard:

---

[3] The dissent claims that "refusal to obey lawful orders of law enforcement has always been deemed sufficient conduct to support an obstruction conviction." Dissent at 11. We have never so held, and, under our limiting construction of the obstruction statute, it cannot be.

10

> That E.J.J.'s behavior may have caused a minor delay is of no import. Although the officer's request that E.J.J. return to his home and close both doors might have been an attempt for a more *convenient* resolution of the situation, "[s]tates cannot consistent[] with our Constitution abridge those freedoms to obviate slight inconveniences or annoyances."

*E.J.J.*, 183 Wn.2d at 506 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 501-02, 69 S. Ct. 684, 93 L. Ed. 834 (1949)). Lack of cooperation does not become obstruction of justice merely because it causes the police delay. "As a general proposition, there is no obligation to cooperate with the police." *State v. D.E.D.*, 200 Wn. App. 484, 494, 402 P.3d 851 (2017) (citing *State v. Budik*, 173 Wn.2d 727, 272 P.3d 816 (2012)). "The duty imposed by the obstructing statute is not to hinder or delay the police investigation; there is no duty to cooperate." *Id.* at 495 (citing *State v. Holeman*, 103 Wn.2d 426, 693 P.2d 89 (1985)).[4] While cooperation with the police might have been wise, the failure to do so was not criminal under these circumstances.

The city analogizes this to cases where officers had a warrant or other court order. But the officers here did not have a warrant or other court order. No impartial magistrate authorized the intrusion. These cases are not helpful

---

[4] Indeed, the jury's question during deliberation, "Does a person have the legal obligation to follow the police instructions, in this case?" touches on this vital principle. CP at 43. We do not fault the judge for not answering it during deliberations. But this case does turn on when a person has a legal obligation to follow an officer's directions.

11

to the city. *See, e.g.*, *State v. Miller*, 74 Wn. App. 334, 873 P.3d 1197

(1994). The city also analogizes to cases where a defendant actively resisted

officers' warrantless entry. In *State v. Line*, the defendant physically

struggled with officers, ripping their clothing. 121 Haw. 74, 81, 214 P.3d

613 (2009). In *Dolson v. United States*, the court stressed that "one has a

Fourth Amendment right to deny police officers and other government

officials a warrantless entry into one's home, and thus one's assertion of this

right cannot serve as the basis for a criminal conviction or evidence of a

crime." 948 A.2d 1193, 1201 (D.C. 2008) (citing *Camara*, 387 U.S. at 540;

*Little*, 339 U.S. at 7; *Prescott*, 581 F.2d at 1350-51). The court declined to

extend that principle to locking and holding a gate closed against an officer

in pursuit. *Id.* at 1202.[5] There was no evidence here that McLemore locked

the door to exclude officers, held it closed, or physically resisted. These

cases are not helpful to the city either.

In contrast, in the vast majority of cases called to our attention, courts

have held that there is no obligation to open a home to an officer's

warrantless demand for entry. The city of Columbus, for example,

---

[5] This, of course, is what distinguishes Dolson's conduct from McLemore's. Dolson shut his gate, locked it, and held it shut to keep out the police. *Dolson*, 948 A.2d at 1197. McLemore refused to open an already-locked door. Because of Dolson's active resistance, he was not entitled to a passive resistance instruction. *Id.* at 1201. McLemore did not resist, he simply did not open the door. *But see* dissent at 16 (treating Dolson's active resistance as analogous).

prosecuted a man who refused to open the door to allow officers responding to a potential domestic violence call to enter his home. *City of Columbus v. Michel*, 55 Ohio App. 2d 46, 47-48, 378 N.E.2d 1077 (1978). Officers spoke with the person who made the call, saw broken glass, knocked for 7 to 10 minutes, and told the occupants to either let them in or have their door broken down. *Id.* at 46-47. The court noted that the officers were "justified in breaking open the door of the apartment to determine whether anyone was injured in the apartment." *Id.* at 48. But the "defendant's failure to open the door to the apartment is not made a crime" under the ordinance. *Id.*; *see also Beckom v. State*, 286 Ga. App. 38, 41, 648 S.E.2d 656 (2007) (refusing to open the door or answer the phone, "without more, does not constitute obstruction of the police, even if it is the police doing the knocking and ringing"); *State v. Berlow*, 284 N.J. Super. 356, 364, 665 A.2d 404 (Law Div. 1995) (purpose of both the Fourth Amendment and the parallel provision of the New Jersey Constitution "is to stop governmental intrusion at the door. One cannot be penalized for passively asserting that right"). Recently, the New Jersey Supreme Court, on almost identical facts, unanimously held failure to act was not obstruction. *State v. Fede*, ___ A.3d ___, 2019 WL 1118751 (Mar. 12, 2019).

The one exception to these cases brought to our attention by the city is *Steen*, 164 Wn. App. 789. Over a vigorous dissent, *Steen* held that the failure to open the door and leave a travel trailer when commanded to by an officer exercising community caretaking functions can constitute obstruction. *Id.* at 800.

But the *Steen* court relied heavily on case law that involved motor vehicles, not homes. *See id.* at 800-02 (discussing *State v. Contreras*, 92 Wn. App. 307, 966 P.2d 915 (1998)). In *Contreras*, police responded to a report of a possible vehicle prowl and found Contreras sitting in the car. Contreras, who seemed "'out of it,'" did not raise his hands, did not exit the vehicle, and gave only a first name. 92 Wn. App. at 309-10. Contreras was arrested for (though not charged with) obstruction of a law enforcement officer. *Id.* at 309. Contreras argued there was insufficient grounds for the arrest because he merely refused to speak to the officer. The court noted that mere refusal to talk to an officer is insufficient grounds to support an arrest for obstruction. But "Contreras did more than merely refuse to talk. He also disobeyed the officer's orders to put his hands up in view of [the officer], to exit the car, to keep his hands on top of the car, and to provide his name." *Id.* at 316.

Not surprisingly, *Contreras* itself also relied largely on cases involving motor vehicles. *See Contreras*, 92 Wn. App. at 316-17 (citing *State v. Hudson*, 56 Wn. App. 490, 497-98, 784 P.2d 533 (1990); *State v. Little*, 116 Wn.2d 488, 497, 806 P.2d 749 (1991) (plurality opinion); *State v. Mendez*, 88 Wn. App. 785, 792-93, 947 P.2d 256 (1997), *rev'd*, 137 Wn.2d 208, 970 P.2d 722 (1999); *City of Sunnyside v. Wendt*, 51 Wn. App. 846, 851-52, 755 P.2d 847 (1988)). *Hudson, Mendez*, and *Wendt* all implicated statutes that require drivers to cooperate with law enforcement. *Little* was brought under a former version of the obstruction statute that was significantly revised after being repeatedly held unconstitutional. *See* S.B. REP. ON S.B. 6138, 53d Leg., Reg. Sess. (Wash. 1994); *White*, 97 Wn.2d at 103 (describing the previous version of the statute as "flagrantly unconstitutional"). Washington law imposes on drivers and witnesses to traffic accidents a duty to cooperate with officers in many circumstances. *E.g.*, RCW 46.61.020, .021. While Washington law vests officers with the statutory authority to break into a house under certain circumstances, *see, e.g.*, RCW 10.31.040, there is no law requiring people to open their own doors to officers seeking warrantless entry.

Location matters. A home is entitled to constitutional protections that a moving vehicle is not. *See State v. Ferrier*, 136 Wn.2d 103, 112, 960 P.2d

927 (1998). "'[T]he closer officers come to intrusion into a dwelling, the greater the constitutional protection.'" *Id.* (internal quotation marks omitted) (quoting *Young*, 123 Wn.2d at 185). To the extent *Steen* suggests it is obstruction to not open the door to a home in response to a warrantless knock, it is inconsistent with Washington law and is overruled. *See Williams*, 171 Wn.2d at 485; *White*, 97 Wn.2d at 97.

Under the limited construction we are required to give the obstruction statute to render it constitutional, the city presented insufficient evidence to sustain this conviction. Taken in the light most favorable to the city, McLemore refused to open the door, loudly insisted he had no obligation to do so, and told Lisa to tell the officers she was okay. None of this is punishable "conduct" under our limiting construction of the obstruction statute. Further, our review of the record leaves us with an abiding concern the jury could have convicted on speech alone. *See E.J.J.*, 183 Wn.2d at 501 (citing *Abrams*, 163 Wn.2d at 282). Much of the evidence focused on what McLemore and the officers shouted at one another. There was no evidence presented that McLemore closed his door to prevent the officers' entry or prevented Lisa from opening it. Accordingly, we reverse.[6]

---

[6] Given our disposition, we do not reach the remaining arguments. We note in passing that it is questionable whether a defendant can appeal the denial of a *Knapstad* motion after the case has gone to trial. *State v. Zakel*, 61 Wn. App. 805, 811 n.3, 812 P.2d 512

CONCLUSION

We hold the city presented insufficient evidence to sustain

McLemore's conviction and remand to the trial court for further proceedings

consistent with this opinion.

---

(1991) (declining to review a denial of a *Knapstad* motion after trial); *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986); CrR 8.3(c)(3) ("A decision denying a motion to dismiss under this rule is not subject to appeal under RAP 2.2.").

_Gonzátez, J._

WE CONCUR:

_Fairhurst, C.J._

_Geor. McCloud, J._

No. 95707-0

STEPHENS, J. (dissenting)—In asking this court to overturn his conviction, Solomon McLemore appeals broadly to privacy rights, free speech rights, and the fact that individuals owe no duty to assist law enforcement. These appeals obscure the fact that everyone, including McLemore, agrees the officers responding to the domestic violence call had the constitutional authority to demand entry pursuant to the community caretaking exception to the warrant requirement. And, settled precedent makes clear that refusing to obey lawful commands to take a specific action is conduct sufficient to support an obstruction conviction. I disagree with the lead opinion that McLemore's conviction rests "mostly" on speech and involves only passive "inaction" while inside his home. Lead opinion at 2, 7, 15-16.

I would continue our long tradition of holding that individuals cannot willfully disobey law enforcement orders without facing legal consequences. Though no one

owes an affirmative obligation to assist the police, obstruction in violation of RCW 9A.76.020 involves more than the mere refusal to assist. On the night in question, McLemore's right to privacy in his home yielded to the officers' authority to demand entry in order to verify the safety of the occupants inside. His obstruction conviction rests not on pure speech or mere inaction but on his willful conduct that hindered, delayed, or obstructed law enforcement in the discharge of their official duties. I would affirm the Court of Appeals and uphold McLemore's conviction.

## ANALYSIS

This case arises in the context of officers responding to a late-night domestic disturbance call. Upon arriving outside McLemore's building, officers heard shouting and then the sound of glass breaking. When they loudly knocked on the door, all went silent. Clerk's Papers (CP) at 304, 324, 362, 365. Despite being given several explanations as to why officers were at his door and several chances to comply, McLemore refused to open the door to allow officers to verify the safety of McLemore's girlfriend, Lisa,[1] and the couple's child. Deputy Ben Emmons testified:

> [I gave v]ery basic commands, clear and concise. This is Shoreline Police Department, please open the door. Shoreline Police Department, come and

---

[1] Consistent with the lead opinion, and to avoid subjecting her to unwanted publicity, I refer to McLemore's girlfriend solely by her first name. No disrespect is intended.

talk to us. Shoreline Police Department, let me see your face. Shoreline Police Department, call 911. I want to give as many options as possible. I know some people are antsy about contacting the police face to face so I took that into account. If they wanted to call 911 that was fine. If they want to peek over the balcony that was fine too. I just wanted to establish some kind of back and forth and I was getting none.

CP at 364-65. When officers finally did get a response, they once again clearly explained that their intention was to verify the safety of all occupants in the home:

> So as we continued kind of in this repetitive loop of conversation, at some point a female comes to the door and he said tell them you're okay. We had been telling him we need to make sure that everyone is okay. We need to know that everyone is okay because of what is going on here. So the female at some point comes to the door and he says, tell them you're okay. The female said I'm okay. A[t] this point they both said something like we're scared or something of that nature. But we tell them, we can't just take your word for it. You telling her to tell us you're okay isn't enough for us to verify that you're okay. He could be forcing you to say this. We have no idea. You're behind a door and we have no idea what's going on. We need to investigate.

CP at 330-31 (Test. of Deputy Jeremy Dallon).[2] The record continues to detail repeated instances where the officers make clear that they are giving a lawful order

---

[2] The lead opinion downplays the fact that McLemore told Lisa how to respond, *see* lead opinion at 4 ("At McLemore's insistence, Lisa confirmed that she was fine and that she also wanted the officers to leave."), ultimately concluding there is "no evidence" he did anything to prevent her from opening the door. *Id.* at 15-16. The testimony and a recording of the incident support a different conclusion. Deputy Dallon testified that Lisa "sounded like she had been crying. . . . [I]t didn't sound like a calm, normal individual." CP at 331. He explained, "[McLemore] saying tell them you're okay seemed very coercive"; officers "have the legal obligation to investigate to make sure that someone who needs help isn't being prevented from getting help because of various reasons." *Id.* On cross-examination, McLemore grudgingly acknowledged that he told Lisa she needed to talk to the police and she needed to act mad. CP at 440. He also told her that if she opened the door and went outside, he was going to jail. CP at 441. Given this evidence, even if

-3-

to open the door so they can verify the safety of the occupants inside. *See* CP at 302, 304-05, 314-15, 324-31, 361-80. McLemore acknowledged this fact in his testimony:

> They said we're coming in. We need to come in. We need to make sure everybody is okay. And I asked them all the relevant questions as to why— legal entry. Do you have anything to show me that shows me you can come in?
>
> . . . .
> . . . They tell me they don't have to. They don't need to show me anything to get in. And then I tell them, well then in that case you need to go away.

CP at 414. McLemore acknowledged that the officers even gave him the option to call 911 to verify that they were the police. CP at 438; *see also* CP at 329 ("You can call the police, 911. They'll tell you that we're the police, let us in.") (Test. of Deputy Dallon).

Though the lead opinion describes the issue in this case as whether an individual has the duty to assist a warrantless search or seizure, the officers made no demand to search the home. *See* CP at 294-381. The record makes clear that the officers wanted to fulfill their statutory duty to verify Lisa's safety as part of their community caretaking responsibility.[3]

---

McLemore's own refusal to open the door might be characterized as mere "inaction"—a dubious characterization under our case law—evidence that he directed Lisa's response to the officers' commands plainly supports the jury's finding of obstruction.

[3] RCW 10.99.030 imposes specific requirements on law enforcement when responding to a domestic violence report. For example, officers are required to "take a

-4-

McLemore's conduct falls squarely within the ambit of the obstruction statute, and his conviction is fully consistent with constitutional guaranties of privacy and free speech. Because there is no constitutional infirmity in McLemore's conviction, I believe our judicial role requires us to apply the statute the legislature has seen fit to adopt and the executive branch has seen fit to enforce, and to respect the jury's verdict. To explain why, I first address the statute, RCW 9A.76.020, and then consider the privacy and free speech rights asserted to excuse McLemore's violation of the statute.

I.    *Sufficient Evidence Supported the Jury's Finding That McLemore Committed Obstruction under RCW 9A.76.020*

The statute under which McLemore was convicted provides, "A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020(1). It is undisputed that the officers responding to the 911 call were discharging their official powers or duties. Mot. for Discr. Review at

---

complete offense report including the officer's disposition of the case" and "advise victims of all reasonable means to prevent further abuse, including advising each person of the availability of a shelter or other services in the community, and giving each person immediate notice of the legal rights and remedies available." RCW 10.99.030(6)(b)-(7). The responding officers testified that it would have been difficult to fulfill their statutory duties in this instance without a visual verification of Lisa's safety and the ability to speak with her separate from McLemore. CP at 330-31, 363, 371.

3; lead opinion at 6. Absent a constitutional privilege, McLemore had a statutory duty not to willfully hinder, delay, or obstruct law enforcement.

The lead opinion frames this case in terms of a "duty to cooperate" with law enforcement and invokes the general rule that no such duty exists. *See* lead opinion at 10-11. In so doing, it characterizes McLemore's conduct as involving only "passive delay" and observes that behavior causing minor delay or inconvenience does not amount to obstruction. *Id.* at 10 (quoting *State v. E.J.J.*, 183 Wn.2d 497, 506, 354 P.3d 815 (2015)). I believe this misstates both the facts of this case and the valid reach of the obstruction statute. While individuals interacting with the police owe no affirmative duty to cooperate, it is well recognized they may not engage in conduct that interferes in specific ways with law enforcement officers' discharge of their powers or duties. *See State v. D.E.D.*, 200 Wn. App. 484, 494-95, 402 P.3d 851 (2017) (recognizing valid reach of obstruction statute despite no general obligation to cooperate with a police investigation); *State v. Steen*, 164 Wn. App. 789, 802 n.8, 265 P.3d 901 (2011) (recognizing obstruction statute does not criminalize a "citizen's mere refusal to assist police officers performing their community caretaking duties"). Hindering or causing material delay in lawful police efforts is punishable as obstruction. *See D.E.D.*, 200 Wn. App. at 495 (describing examples of obstruction: interfering in the arrest of another, refusing to obey

commands designed to control the scene, and failing to obey commands to exit a car and keep hands in sight).

In *D.E.D.*, the Court of Appeals overturned an obstruction conviction because the charged conduct involved only "[p]assive resistance" to an unlawful arrest. 200 Wn. App. at 496. Central to the reasoning in *D.E.D.* was the fact that a separate resisting arrest statute (RCW 9A.76.040(1)) imposed a duty not to resist only in situations of a *lawful* arrest and the defendant's arrest was plainly unlawful. *Id.* Under the obstruction statute, the court held that *D.E.D.* did not "hinder or obstruct the officer since he had no obligation to cooperate with the officer." *Id.*[4] The court cautioned against extending its narrow holding beyond the context of "[p]assive resistance consistent with the lack of a duty to cooperate." *Id.*

---

[4] This is not to say that individuals may violate unlawful police commands without legal consequences. The court in *D.E.D.* surveyed precedent recognizing that a person "cannot respond to police illegality by performing a criminal act in return." 200 Wn. App. at 492; *see also State v. Holeman*, 103 Wn.2d 426, 693 P.2d 89 (1985) (illegality of arrest did not justify hindering officers). The main rationale for this rule is public safety: the right to be free from illegal police conduct "can be protected and vindicated through legal processes, whereas loss of life or serious physical injury cannot be repaired in the courtroom." *State v. Westlund*, 13 Wn. App. 460, 467, 536 P.2d 20 (1975); *see also United States v. Pryor*, 32 F.3d 1192, 1195 (7th Cir. 1994) (stating the "indignity and inconvenience" of an improper arrest is less serious than injuries "engendered by encouraging suspects to make their own snap judgments about the legality of official demands"); *State v. Hatton*, 116 Ariz. 142, 147-48, 568 P.2d 1040 (1977) ("If resistance to an arrest or a search made under the color of law is allowed, violence is not only invited but can be expected.").

Unlike the juvenile in *D.E.D.*, McLemore *did* have the duty to comply with lawful police orders to open the door and allow officers to verify Lisa's safety. Describing his refusal to open the door in this context as akin to D.E.D.'s "passive resistance" requires ignoring that McLemore testified he made an intentional—found to be willful—decision to disobey a direct, lawful order. I recognize that it may be difficult in some situations to distinguish between an affirmative duty to cooperate and a duty not to hinder or delay police, but this is not one of them.

Indeed, the facts of this case align with the cases the court in *D.E.D.* was careful to distinguish. 200 Wn. App. at 495; *see State v. Little*, 116 Wn.2d 488, 498, 806 P.2d 749 (1991) (plurality opinion) (flight from officers and refusal to stop when ordered to do so constituted obstruction of a public servant); *Steen*, 164 Wn. App. at 802 (refusal to open trailer door and exit with hands up held punishable under the obstruction statute); *State v. Contreras*, 92 Wn. App. 307, 316-17, 966 P.2d 915 (1998) (refusal to comply with orders to keep hands in view, exit the vehicle, and keep hands on top of the car supported obstruction conviction). The lead opinion recognizes the affinity between this case and these prior authorities, and its only response is to overrule *Steen* and to distinguish any case involving a car or a prior

version of the obstruction statute. Lead opinion at 13-14. This approach does not withstand scrutiny.

The lead opinion's dismissal of *Steen* appears to rest solely on the fact that *Steen* "relied heavily on case law that involved motor vehicles, not homes." *Id.* at 13 (citing *Contreras*, 92 Wn. App. 307). This undeveloped analysis misapprehends the key distinction in Washington law that is explained in *Steen*—between the duty to follow lawful orders given by law enforcement as opposed to no duty to assist with an unlawful arrest. *Compare Steen*, 164 Wn. App. at 801 (duty to obey officer's commands), *with D.E.D.*, 200 Wn. App. at 496 (no duty to cooperate in unlawful arrest). Far from supporting an automobile/home distinction, *Steen* explicitly states that it is following the precedent set in *Contreras* that "an individual's failure to follow police officers' lawful orders authorized the individual's warrantless arrest for obstruction." *Steen*, 164 Wn. App. at 801. Just as failure to comply with officer's demands to keep his hands in view and exit the vehicle constituted conduct for the purposes of the obstruction statute under *Contreras*, so too "refusal to open the trailer door and exit the trailer with his hands up" constituted conduct in *Steen* sufficient to support an obstruction conviction. *Id.* at 801-02. The decision in *Steen* is not an outlier but instead a correct application of our precedent recognizing that failure to obey a lawful order constitutes conduct sufficient for an obstruction conviction.

That precedent includes this court's decisions in *Williams* and *Little*. *See State v. Williams*, 171 Wn.2d 474, 251 P.3d 877 (2011); *Little*, 116 Wn.2d at 488. In *Williams*, we traced the development of obstruction statutes and free speech protections and narrowly construed RCW 9A.76.020 to require some conduct in addition to making false statements in order to support a conviction. 171 Wn.2d at 481-82. In the course of our analysis, we cited *Contreras* ("refusal to put hands up in view, to exit the car, and to keep hands on top of car as instructed and providing a false name") as an example of what constitutes *conduct* as opposed to *pure speech*. *Id.* at 483. In *Little*, which involved a *Terry*[5] stop at an apartment complex, we recognized that the willful refusal to obey direct police orders violated the obstruction statute. 116 Wn.2d at 498 ("flight from the officers and refusal to stop when ordered to do so constituted an obstruction of a public servant").

The lead opinion attempts to minimize *Little* as having been decided under a former version of the obstruction statute, which we later declared unconstitutional. Lead opinion at 14. The aspect of the statute we invalidated, however, involved a requirement that individuals stop and identify themselves when directed by law enforcement. *See State v. White*, 97 Wn.2d 92, 96-97, 640 P.2d 1061 (1982). As recently explained in *E.J.J.*, the constitutional problem with the former statute was

---

[5] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

a provision that forced individuals to speak up and provide information to law enforcement, i.e., it punished pure speech. 183 Wn.2d at 502. But, we recognized that our decision in *White* "left intact subsection (3) [of former RCW 9A.76.020 (1975)], which made it a misdemeanor to "'knowingly hinder, delay, or obstruct'" a public servant." *Id.* (quoting *White*, 97 Wn.2d at 96 (quoting former RCW 9A.76.020)). While the wording of the obstruction statute has evolved to recognize that speech alone cannot support an obstruction conviction, *see Williams*, 171 Wn.2d at 481-83, the refusal to obey lawful orders of law enforcement has always been deemed sufficient conduct to support an obstruction conviction when it hinders, delays, or obstructs the performance of official duties. *See id.*; *Little*, 116 Wn.2d at 498; *Contreras*, 92 Wn. App. at 317; *Steen*, 164 Wn. App. at 802. As a result, the relevant question in this case is not whether McLemore was in his home or in a vehicle, as the lead opinion would suggest. Instead, the relevant question, according to precedent, is whether McLemore's refusal to obey lawful police orders hindered, delayed, or obstructed the officers in the performance of their duties.

Sufficient evidence exists to support McLemore's conviction for obstruction based on his willful failure to obey a lawful police order to open the door (or to allow Lisa to open the door) in order for officers to verify the safety of the occupants inside the home. It cannot be denied that McLemore's actions had specific consequences

that both hindered and delayed the officers from performing their community caretaking duties. Officers spent several minutes trying to convince McLemore or Lisa to open the door; then, after hearing glass shattering, they attempted unsuccessfully to break the door or lock with a pickax, before finally having the Shoreline Fire Department arrive with breaching tools to help police forcibly enter the home. All essential elements of the obstruction statute are supported by evidence sufficient to sustain McLemore's conviction, and we should not disturb it unless McLemore can demonstrate that his conduct was constitutionally privileged. As discussed below, he has not demonstrated that his conviction violates either his privacy rights or his free speech rights.

II.    *McLemore's Obstruction Conviction Does Not Offend His Privacy Rights under the Fourth Amendment and Article I, Section 7 Because the Officers Acted with Authority of Law*

Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." While the gold standard for authority of law is a judicially issued warrant, "there are a few '"jealously and carefully drawn" exceptions' to the warrant requirement which 'provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate.'" *State v. Houser,*

95 Wn.2d 143, 149, 622 P.2d 1218 (1980) (quoting *Arkansas v. Sanders*, 442 U.S. 753, 759, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979)). Relevant here, the community caretaking exception "allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance or when making routine checks on health and safety." *State v. Thompson*, 151 Wn.2d 793, 802, 92 P.3d 228 (2004). Once the community caretaking exception applies, police officers are allowed to conduct a noncriminal investigation, "so long as it is necessary and strictly relevant to performance of the community caretaking function." *State v. Kinzy*, 141 Wn.2d 373, 388, 5 P.3d 668 (2000).

Both McLemore and the lead opinion acknowledge that the officers responding to the 911 call had authority of law under the community caretaking warrant exception. *See* Mot. for Discr. Review 8-16; lead opinion at 6 ("McLemore, wisely, does not challenge the trial court's conclusion that the officers were exercising their community caretaking function at the time."). "Police officers responding to a domestic violence report have a duty to ensure the present and continued safety and well-being of the occupants" of a home. *State v. Raines*, 55 Wn. App. 459, 465, 778 P.2d 538 (1989), *review denied*, 113 Wn.2d 1036 (1990). This duty is recognized in statute. RCW 10.99.030(5) provides that "[t]he primary duty of peace officers, when responding to a domestic violence situation, is to

enforce the laws allegedly violated and to protect the complaining party." In addition, the legislature has decided that it is not enough for a police officer to simply observe the safety of a potential victim; even in cases where the officer has "not exercised arrest powers or decided to initiate criminal proceedings by citation or otherwise," officers are still required to "notify the victim of the victim's right to initiate a criminal proceeding" and advise all parties of the importance of preserving evidence. RCW 10.99.030(6)(a). Bearing these requirements in mind, the lead opinion concedes that "[i]t is undisputed that the officers here responded appropriately and lawfully to a potential domestic violence situation in which both Lisa and the child reasonably appeared in immediate danger." Lead opinion at 7.

One is left to wonder why, then, the lead opinion embarks on a detailed privacy analysis under the Fourth Amendment of the United States and article I, section 7. Its eloquent exposition of an individual's right to keep the government from crossing the threshold to his home presupposes a different set of facts—officers seeking a warrantless entry *without* constitutional authority of law. *See* lead opinion at 8-10. Here, the officers correctly explained to McLemore that they did not need a warrant to justify the limited intrusion they were seeking. The lead opinion seems to suggest that McLemore's refusal to open the door would be viewed differently had the officers held an actual warrant instead of authority of law under a warrant

exception. Lead opinion at 11. But, it does not explain why. Certainly, from the perspective of a person refusing an officer's command to open a door, there is no reason why the officer's assertion that he has a warrant would be any more persuasive than his assertion that he has other authority of law. Moreover, neither the chilling of privacy rights that the lead opinion is concerned about nor the constitutional authority of law the officers possess varies between the warrant scenario and the warrant exception scenario. The case law the lead opinion cites speaks to a privacy right McLemore did not possess here—the right to refuse entry to officers acting entirely without authority of law under either a warrant or a recognized warrant exception.

In attempting to create legal justification for McLemore's actions, the lead opinion misreads *Dolson v. United States*, 948 A.2d 1193, 1201 (D.C. 2008). Lead opinion at 11-12. While *Dolson* explains that individuals have a Fourth Amendment right to deny police officers warrantless entry into a home, *Dolson* makes clear that "[t]his right to deny entry to a warrantless officer is not unlimited, however, despite the constitutional right involved." *Dolson*, 948 A.2d at 1201. It provides no solace in McLemore's case because, even absent authority of law under an exception to the warrant requirement, *Dolson* concludes that "just as no one has the right to resist an unlawful arrest, no one has the right to resist an unlawful entry to make an arrest."

*Id.* (footnote omitted). This holding is consistent with the precedent noted previously, recognizing that a person's recourse to unlawful police activity is through a court action, not self-help.

Simply stated, McLemore's conduct cannot be excused on the basis of a nonexistent privacy right. His right to deny the officers entry to his home necessarily yields to valid authority of law, under a warrant exception just as surely as under a warrant. While the lead opinion is correct that McLemore's privacy in his home is entitled to greater constitutional protection than a person's privacy in a vehicle or on the street, the greater weight of the privacy interest has no bearing on the question before us. Heightened privacy protections in the home affect the court's determination as to when authority of law exists to justify an intrusion. But regardless of whether individuals are in a home, in a vehicle, or on the street, once they receive a *lawful* order from law enforcement, they have a statutory duty to comply. Because all parties agree that McLemore received a lawful order from the officers, we cannot excuse his willful refusal to comply with this order simply because it involved opening the door to his home.

### III.    McLemore's Obstruction Conviction Is Consistent with Free Speech Protections Because It Does Not Rest on "Speech Alone"

Having established that McLemore had no privacy-based right to disobey lawful police commands and that his refusal to open the door is punishable under the obstruction statute, I turn to the remaining proposition: that McLemore's conviction rests purely on speech rather than conduct. To avoid constitutional infirmities, Washington law requires "conduct in addition to pure speech in order to establish obstruction of an officer." *Williams*, 171 Wn.2d at 485-86; *see also E.J.J.*, 183 Wn.2d at 502 ("a conviction for obstruction may not be based solely on an individual's speech because the speech itself is constitutionally protected").

Consistent with prior case law, McLemore's actions constituted punishable conduct and his conviction did not rest on "speech alone." *E.J.J.*, 183 Wn.2d at 503. His conduct included willfully and repeatedly refusing to open the door, as well as directing Lisa's response to the officers' commands, supporting a jury inference that he prevented her from opening the door. Contrary to the lead opinion's view, it is not enough to observe that "[m]uch of the evidence focused on what McLemore and the officers shouted at one another." Lead opinion at 16. The cases that have invalidated obstruction convictions on free speech grounds all involve speech *alone* without sufficient evidence of accompanying conduct. In *State v. Williamson*, for

example, the defendant was charged with obstruction for falsely telling police his name was "'Christopher Columbus.'" 84 Wn. App. 37, 45, 924 P.2d 960 (1996). Similarly, in *Williams*, the defendant was convicted for giving a false name to police during a traffic stop. 171 Wn.2d at 476. In *E.J.J.*, we reviewed our state and related federal precedent imposing free speech limits on obstruction convictions and vacated a juvenile adjudication where there was "insufficient evidence of conduct," 183 Wn.2d at 506, and where we could not "be certain that E.J.J.'s conviction was not based on his speech alone," *Id.* at 508. Here, in contrast, McLemore plainly engaged in conduct in addition to speech, and there is no constitutional infirmity when both speech and conduct are present. *See Williams*, 171 Wn.2d at 477-78; *Little*, 116 Wn.2d at 498; *E.J.J.*, 183 Wn.2d at 502.

Without doubt, our precedent confirms that obstruction statutes may be constitutionally applied to punish individuals for willful conduct in refusing to obey law enforcement directives when such conduct hinders, delays, or obstructs the performance of official duties—even when speech is also involved. Such punishment under the obstruction statute is wholly consistent with constitutional constraints because it does not rest on "speech alone." *E.J.J.*, 183 Wn.2d at 503; *see also Williams*, 171 Wn.2d at 485 ("We hew to our jurisprudential history of requiring conduct in addition to pure speech in order to establish obstruction of an officer.").

As discussed above, the metaphysical distinction the lead opinion draws between action and inaction is nowhere to be found in our precedent. When a law enforcement officer tells a person to "put your hands up" or "open the door," the willful refusal to obey this command constitutes conduct—and such conduct violates RCW 9A.76.020.

## CONCLUSION

Thankfully, in this case there was no physical harm to any of the parties involved. But recognizing the sort of "privilege to obstruct" that McLemore seeks will encourage individuals to "make their own snap judgments about the legality of official demands," *Pryor*, 32 F.3d at 1195, and "violence is not only invited but can be expected." *Hatton*, 116 Ariz. at 148. There is no precedent that supports recognizing this privilege and no constitutional privacy or free speech rights at issue here that justify it. While reasonable minds might disagree about whether the officers or the prosecutor were overzealous in charging McLemore with obstruction or even whether the legislature should criminalize the refusal to obey police orders to open one's door, courts must leave those decisions to other branches of government. Our judicial role is constrained to invalidating arrest and prosecution decisions only when they result in constitutional violations. Because McLemore's

conviction does not violate his constitutional rights, I would affirm the Court of Appeals and uphold his conviction.

Stephens, J.

Owens, J.

Wiggins, J.